UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-5641
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALFONSO LOPEZ, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court for the
Western District of Texas
_____

(     September 15, 1993     )

Before REAVLEY, KING and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

The United States Constitution establishes a national
government of limited and enumerated powers.  As James Madison put
it in *The Federalist Papers*, "The powers delegated by the proposed
Constitution to the federal government are few and defined.  Those
which are to remain in the State governments are numerous and
indefinite."  The Federalist No. 45, at 292 (C. Rossiter ed. 1961).
Madison's understanding was confirmed by the Tenth Amendment.  It
is easy to lose sight of all this in a day when Congress
appropriates trillion-dollar budgets and regulates myriad aspects

of economic and social life.  Nevertheless, there are occasions on which we are reminded of this fundamental postulate of our constitutional order.  This case presents such an occasion.

## Proceedings Below

On March 10, 1992, defendant-appellant Alfonso Lopez, Jr., then a twelfth-grade student attending Edison High School in San Antonio, Texas, arrived at school carrying a concealed .38 caliber handgun.  Based upon an anonymous tip, school officials confronted Lopez, who admitted that he was carrying the weapon.  Although the gun was unloaded, Lopez had five bullets on his person.  After being advised of his rights, Lopez stated that "Gilbert" had given him the gun so that he (Lopez) could deliver it after school to "Jason," who planned to use it in a "gang war."  Lopez was to receive $40 for his services.

Lopez was charged in a one-count indictment with violating 18 U.S.C. § 922(q), which makes it illegal to possess a firearm in a school zone.[1]  After pleading not guilty, Lopez moved to dismiss the indictment on the ground that section 922(q) "is unconstitutional, as it is beyond the power of Congress to legislate control over our public schools."  His brief in support of the motion further alleged that section 922(q) "does not appear to have been enacted in furtherance of any of those enumerated

---

[1]     Initially, state charges were filed against Lopez but those charges were dropped due to the federal prosecution.  What Lopez did has been a felony under Texas law since at least 1974.  See Tex. Penal Code § 46.04(a) (whoever "with a firearm . . . goes . . . on the premises of a school or an educational institution, whether public or private . . ."); § 46.04(c) (third degree felony).

powers" of the federal government. The district court denied the motion, concluding that section 922(q) "is a constitutional exercise of Congress' well-defined power to regulate activities in an[d] affecting commerce, and the 'business' of elementary, middle and high schools . . . affects interstate commerce." Lopez thereafter waived his right to a jury trial and was tried to the bench upon stipulated evidence. The court found Lopez guilty and sentenced him to six months' imprisonment to be followed by two years' supervised release. Lopez now appeals his conviction and sentence. Lopez's sole objection to his conviction is his constitutional challenge to section 922(q); he does not otherwise contest his guilt. We now reverse.

### Overview

So far as we are aware, the constitutionality of section 922(q), also known as "the Gun-Free School Zones Act of 1990," is a question of first impression in the federal courts.[2] Section 922(q)(1)(A) provides: "It shall be unlawful for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone."[3] Section 922(q)(1)(B) then carves out several limited exceptions,

---

[2] Section 922(q) became law November 29, 1990, as section 1702 of the Crime Control Act of 1990, P.L. 101-647, 101st Cong. 2d Sess., 104 Stat. 4789, 4844-45. Its effective date was sixty days later. P.L. 101-647, § 1702(b)(4).

[3] The Act defines a school zone as follows: "(A) in, or on the grounds of, a public, parochial or private school; or (B) within a distance of 1,000 feet from the grounds of a public, parochial or private school." 18 U.S.C. § 921(a)(25). "School" is defined as "a school which provides elementary or secondary education under State law." Section 921(a)(26). Lopez stipulated that Edison High School was and is a school zone.

3

none of which are applicable here.[4]   Section 922(q)(2) makes it

---

4      Section 922(q)(1)(B) provides:

     "(B) Subparagraph (A) shall not apply to the
possession of a firearmSQ

        (i) on private property not part of
     school grounds;

        (ii) if the individual possessing the
     firearm is licensed to do so by the State in
     which the school zone is located or a
     political subdivision of the State, and the
     law of the State or political subdivision
     requires that, before an individual obtain
     such a license, the law enforcement
     authorities of the State or political
     subdivision verify that the individual is
     qualified under law to receive the license;

        (iii) which isSQ

        (I) not loaded; and
        (II) in a locked container, or a locked
     firearms rack which is on a motor vehicle;

        (iv) by an individual for use in a
     program approved by a school in the school
     zone;

        (v) by an individual in accordance with
     a contract entered into between a school in
     the school zone and the individual or an
     employer of the individual;

        (vi) by a law enforcement officer acting
     in his or her official capacity; or

        (vii) that is unloaded and is possessed
     by an individual while traversing school
     premises for the purpose of gaining access to
     public or private lands open to hunting, if
     the entry on school premises is authorized by
     school authorities."

     Thus, section 922(q)(1), together with section 922(a)(25) &
(26) (note 3, *supra*), makes it a federal offense to carry an
unloaded firearm in an unlocked suitcase on a public sidewalk in
front of one's residence, so long as that part of the sidewalk is
within one thousand feetSQtwo or three city blocksSQof the
boundary of the grounds of any public or private school anywhere

illegal, again with some exceptions, to intentionally or recklessly discharge a firearm in a known school zone.  Section 922(q)(3) disclaims any intent on the part of Congress to preempt state law. Violations are punishable by up to 5 years' imprisonment and a $5,000 fine.  18 U.S.C. § 924(a)(4).

"As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government."  *Gregory v. Ashcroft*, 111 S.Ct. 2395, 2399 (1991). Justice O'Connor's observation is particularly apt in the context of this case, which pits the states' traditional authority over education and schooling against the federal government's acknowledged power to regulate firearms in or affecting interstate commerce.  Lopez argues that section 922(q) exceeds Congress' delegated powers and violates the Tenth Amendment.[5]  The government counters that section 922(q) is a permissible exercise of Congress' power under the Commerce Clause.[6]  In actuality, the Tenth Amendment and Commerce Clause issues in this case are but two sides of the same coin.  As Justice O'Connor has explained:

"In a case like this one, involving the division of

---

in the United States, regardless of whether it is during the school year or the school is in session.  In Texas, at least, a tiny church kindergarten would be included.  *See United States v. Echevaria*, 995 F.2d 562, 563 & n.5 (5th Cir. 1993); Tex. Ed. Code Ann. § 21.797 (Vernon Supp. 1993).

[5]     "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. Const., Amend. X.

[6]     "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const., Art. I, § 8, cl. 3.

authority between federal and state governments, the two inquiries are mirror images of each other. If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; if a power is an attribute of state sovereignty reserved by the Tenth Amendment, it is necessarily a power the Constitution has not conferred on Congress." *New York v. United States*, 112 S.Ct. 2408, 2417 (1992).

Thus, even if Lopez is correct that section 922(q) intrudes upon a domain traditionally left to the states, it is constitutional as long as it falls within the commerce power. *See Gregory v. Ashcroft*, 111 S.Ct. at 2400 ("As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States."). This is not to say, however, that the Tenth Amendment is irrelevant to a Commerce Clause analysis. Our understanding of the breadth of Congress' commerce power is related to the degree to which its enactments raise Tenth Amendment concerns, that is concerns for the meaningful jurisdiction reserved to the states. At a more textual level, the Tenth Amendment, though it does not purport to define the limits of the commerce power, obviously proceeds on the assumption that the reach of that power is not *un*limited, else there would be nothing on which the Tenth Amendment could operate.

A good place to begin our analysis is the case of *United States v. Bass*, 92 S.Ct. 515 (1971). At issue in *Bass* was the felon in possession provision of the Omnibus Crime Control Act of 1968, which made it unlawful for any felon to "receive[], possess[], or transport[] in commerce or affecting commerce" any firearm. 18 U.S.C. former § 1202(a)(1). Because the "in commerce or affecting commerce" language might be read to apply only to the

6

crime of transporting a firearm, the question for the Court was whether, in pure possession cases, the government had to prove a connection to commerce or whether section 1202 reached the mere possession of firearms.  The best evidence for the government's position that the statute reached mere possession without any commerce nexus was the floor statements of Senator Long, who introduced section 1202, and the formal findings contained in Title VII of this 1968 act.[7]  While conceding that this legislative history lent "some significant support" for the government's view, *id*. at 521, the Court was not convinced.  Were section 1202 read to punish mere possession without a commerce nexus, the Court argued, it would intrude upon an area of traditional state authority and would push Congress' commerce power to its limit, if not beyond. Because Congress had not clearly expressed its intent to do so, the Court therefore adopted the narrower construction of the statute:

> "[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance.  Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. . . . [Thus] we will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction."  *Id*. at 523 (footnotes omitted).

Significantly, the *Bass* Court noted that "[i]n light of our disposition of the case, we do not reach the question whether, upon appropriate findings, Congress can constitutionally punish the

---

[7]     "Congress hereby finds and declares that the receipt, possession, or transportation of a firearm by felons . . . constitutesSQSQ (1) a burden on commerce or threat affecting the free flow of commerce."  18 U.S.C. § 1201.  *See Bass*, 92 S.Ct. at 521 n.14.

'mere possession' of firearms." *Id*. at 518 n.4. In a subsequent case, the Court held that to satisfy former section 1202's commerce nexus, it need only be shown that the possessed firearm had traveled at some time in interstate commerce. *See Scarborough v. United States*, 97 S.Ct. 1963, 1965 (1977).[8] However, *Scarborough* did not purport to answer the question left open in *Bass*' footnote 4.

The government argues that section 922(q) is no different from a number of other federal firearms crimes. We are not persuaded. With the exception of a few relatively recent, special case provisions, federal laws proscribing firearm possession require the government to prove a connection to commerce, or other federalizing feature, in individual cases. For example, 18 U.S.C. § 922(g), the successor to former section 1202, makes it unlawful for felons and some other classes of persons to "possess [a firearm] in or affecting commerce." Because a commerce nexus is an element of the crime defined by section 922(g), each application of that statute is within the commerce power. *See United States v. Wallace*, 889 F.2d 580, 583 (5th Cir. 1989), *cert. denied*, 110 S.Ct. 3243 (1990) (holding that section 922(g) "reaches only those firearms that [have] traveled in interstate or foreign commerce and is thus constitutional"). Section 922(q), lacking such a nexus requirement, is not on an equal footing with statutes like section 922(g). The government points to several firearm proscriptions not

---

[8] *See also Barrett v. United States*, 96 S.Ct. 498 (1976) (same under 18 U.S.C. § 922(h) as to felon's *receipt* of firearm previously transported in interstate commerce).

requiring the specific firearm to have traveled in commerce, such as: 18 U.S.C. § 922(a)(6) (false statement in acquisition of firearm from licensed dealer, manufacturer, or importer); *id*. § 922(b)(1) & (2) (sale or delivery by licensed dealer, manufacturer, or importer to a minor or in violation of state law); *id*. § 922(b)(4) (sale or delivery by licensed dealer, manufacturer, or importer of certain specified weapons, such as machine guns or short-barrelled rifles); *id*. § 922(m) (recordkeeping violations by licensed dealer, manufacturer, or importer). However, not only do all these proscriptions pertain to essentially commercial actions involving the firearms business, as opposed to mere simple possession by any individual, *cf. United States v. Nelson*, 458 F.2d 556, 559 (5th Cir. 1972) ("acquisition of firearms is more closely related to interstate commerce than mere possession"), but each is also expressly tied to the dealer, manufacturer, or importer in question being *federally* licensed. 18 U.S.C. § 921(a)(9), (10), & (11).[9]

### Historical Outline, Federal Firearms Legislation

---

[9] It does not seem surprising that those who choose to hold a federal license, or to deal with federal licensees, may be required in reference to the activities licensed to conform to federal requirements. *See, e.g., Westfall v. United States*, 47 S.Ct. 629 (1957) (defrauding a state bank that is voluntarily a member of the Federal Reserve System may be made a federal offense because of that membership); *United States v. Dunham*, 995 F.2d 45 (5th Cir. 1993) (robbery of federally insured state bank); *United States v. Hand*, 497 F.2d 929, 934-5 (5th Cir. 1974), *adhered to en banc*, 516 F.2d 472, 477 (5th Cir. 1975), *cert. denied*, 96 S.Ct. 1427 (1976) (status as federally chartered institution supports federal jurisdiction); *United States v. Fitzpatrick*, 581 F.2d 1221, 1223 (5th Cir. 1978) (federal chartering or federal insurance may each support federal jurisdiction). *See also United States v. Mize*, 756 F.2d 353 (5th Cir. 1985).

We now digress to outline at some length the major developments in the history of presently relevant federal firearms control legislation.

General federal domestic legislation in this area may be traced to two enactments, first, the National Firearms Act of 1934, 48 Stat. 1236-1240, originally codified as 26 U.S.C. § 1132, now codified, as amended, as chapter 53 of the Internal Revenue Code of 1986, 26 U.S.C. §§ 5801-5872, and, second, the Federal Firearms Act of 1938, 52 Stat. 1250, originally codified as former 15 U.S.C. § 901-910, now repealed, the provisions of which, as amended and supplemented, have been carried forward to chapter 44 of Title 18, 18 U.S.C. §§ 921 *et seq.*[10]

*The National Firearms Act of 1934*

The National Firearms Act, applicable only to a narrow class of firearms such as machine guns, "sawed-off" shotguns and rifles,

---

[10]    We lay to one side, as irrelevant to our inquiry, diverse federal legislation enhancing the penalty for use or possession of a firearm in the commission of some *other federal offense*. The jurisdictional basis of such legislation is obviously that applicable to the underlying federal offense, and the legislation is properly seen as a regulation of the latter. The same reasoning applies even where, as in the case of 18 U.S.C. § 924(c), the firearms provision is treated as a separate offense (rather than a mere sentence enhancement), as its jurisdictional basis is still that of the other federal offense. *See, e.g., United States v. Owens*, 996 F.2d 59, 61 (5th Cir. 1993); *United States v. Young*, 936 F.2d 1050, 1054-55 (10th Cir. 1991); *United States v. Dumas*, 934 F.2d 1387, 1390 (6th Cir. 1990), *cert. denied*, 112 S.Ct. 641 (1991); *United States v. McDougherty*, 920 F.2d 569, 572 (9th Cir. 1990), *cert. denied*, 111 S.Ct. 1119 (1991); *United States v. Thornton*, 901 F.2d 738, 741 (9th Cir. 1990). Section 922(q), with which we are here concerned, is not tied or related to any other federal offense. Also put to one side is legislation dealing solely with specific matters such as national defense, foreign relations, foreign commerce, federal facilities, and use of the mails, none of which are related to section 922(q).

silencers, and the like, 26 U.S.C. § 5845(a),[11] is grounded on Congress' taxing power under Article I, Section 8, Clause 1. *Sonzinsky v. United States*, 57 S.Ct. 554 (1937); *United States v. Miller*, 59 S.Ct. 816 (1939). Its prohibitions are keyed to the imposition of an excise tax on the business of dealing in such weapons and on transfers of them, together with related requirements for registration of the dealer, the transfers, and the weapons. *See Sonzinsky; Miller; Haynes v. United States*, 88 S.Ct. 772 (1968); *United States v. Freed*, 91 S.Ct. 1112, 1115-1117 (1971). However, section 922(q), which concerns us here, has no roots or antecedent in the National Firearms Act, is in no way related or tied to taxation or any character of registration or reporting, and is applicable to all firearms. Accordingly, the National Firearms Act, and its history and development, are essentially irrelevant to our present inquiry, and we turn our attention to the Federal Firearms Act and its successors.[12]

---

[11]     *See also* former 26 U.S.C. § 1132(a); *United States v. Miller*, 59 S.Ct. 816, 816 n.1 (1939); *Haynes v. United States*, 88 S.Ct. 722, 725 (1968); *United States v. Anderson*, 885 F.2d 1248, 1250 (5th Cir. 1989).

[12]     One might speculate that the 1968 repeal of the Federal Firearms Act and the concomitant incorporation of its proscriptions, as then broadened, into the newly enacted chapter 44 of Title 18, as discussed in detail in the text *infra*, were prompted by the Supreme Court's 1968 decision in *Haynes*, which partially invalidated the National Firearms Act on Fifth Amendment, self-incrimination grounds. However, the congressional committee reports on the 1968 legislation do not reflect such a connection, except in respect to Title II of the Gun Control Act of 1968, which amended the National Firearms Act itself to meet the concerns of *Haynes*. P.L. 90-618, § 201, 90th Cong., 2d Sess. (1968); H.R. Conf. Rep. No. 1956, 90 Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 4426, 4434-35. In 1971 in *Freed* the Supreme Court sustained the thus amended National Firearms Act, holding that the *Haynes* problems had been cured.

11

*The Federal Firearms Act of 1938*

The Federal Firearms Act of 1938 applied to all firearms, former 15 U.S.C. § 901(3), and prohibited "any manufacturer or dealer" not licensed thereunder from transporting, shipping, or receiving any firearm or ammunition "in interstate or foreign commerce," *id.* § 902(a), and also prohibited "any person" from receiving any firearm or ammunition "transported or shipped in interstate or foreign commerce in violation of" section 902(a). *Id.* § 902(b). Licensed dealers and manufacturers could ship firearms interstate only to other licensed dealers and manufacturers and to those who had or were not required to have a license under state law to purchase the firearm, *id.* § 902(c). Licensed dealers and manufacturers were required to keep records of firearms transactions. *Id.* § 903(d). It was made an offense for "any person" to ship or transport "in interstate or foreign commerce" any stolen firearm or ammunition, *id.* § 902(g), and for "any person to transport, ship, or knowingly receive in interstate or foreign commerce" any firearm with an altered or removed serial number. *Id.* § 902(i). It was also made unlawful for "any person" to ship or transport "in interstate or foreign commerce" any firearm or ammunition to any felon, person under felony indictment, or fugitive from justice,[13] *id.* § 902(d); and, felons, those under felony indictment, and fugitives, could not "ship" or "transport" any firearm or ammunition "in interstate or foreign commerce." *Id.*

---

[13] Fugitive from justice was defined to mean one who had fled any state to avoid felony prosecution or testifying in a criminal proceeding. *Id.* § 901(b).

§ 902(e).  Further, felons and fugitives could not "receive any firearm or ammunition that had been shipped or transported in interstate or foreign commerce."  *Id*. § 902(f).  The latter section included a provision that "possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this chapter."  *Id*.[14]  In *Tot v. United States*, 63 S.Ct. 1241 (1943), this presumption was held invalid on due process grounds as applied to whether the weapon "was received by" the defendant "in interstate or foreign commerce" or after the effective date of the act.  *Id*. at 1244, 1245.

*Omnibus Crime Control and Safe Streets Act of 1968*

The Federal Firearms Act remained otherwise in force without significant change until the enactment in June 1968 of the Omnibus Crime Control and Safe Streets Act of 1968, P.L. 90-351, 90th Cong. 2d Sess. (1968) 82 Stat. 197.  Title IV (§§ 901-907) of P.L. 90-351 repealed the Federal Firearms Act (*id*. § 907) and enacted a new chapter 44 ("Firearms") of Title 18 (18 U.S.C. § 921-928), which incorporated, with some amendments, almost all the provisions of the Federal Firearms Act,[15] and added further firearms offenses.

Unlike the Federal Firearms Act, this legislation required a federal license "for any person . . . to engage in the business of importing, manufacturing, or dealing in firearms, or ammunition"

---

[14]   An analogous presumption applied to possession of a firearm with an altered or removed serial number.  *Id*. § 902(i).

[15]   The presumption considered in *Tot* was dropped, as was the analogous presumption concerning altered serial numbers (see note 14, *supra*).

*even though* the business did not operate in interstate commerce. P.L. 90-351, § 902; 18 U.S.C. § 922(a)(1). *See also id*. § 923(a). The relevant committee report states that new section 922(a)(1) "makes it clear that a license is required for an intrastate business as well as an interstate business. The present Federal Firearms Act (15 U.S.C. § 902(a)) merely prohibits the interstate or foreign shipment or receipt of firearms by a manufacturer or dealer unless he has a license." Sen. Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2112 at 2202.[16]

Public Law 90-351 § 901(a) contains, among others, the following express Congressional findings, *viz*:

> "(1) that there is a widespread traffic in firearms moving in or otherwise affecting *inter*state or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power; . . .

> (3) that only through adequate Federal control over *inter*state and foreign commerce in these weapons, *and* over *all* persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with, and effective State and local regulation of this traffic be made possible; . . . ." (emphasis added).[17]

---

[16]    *See also id*. at 2206 (discussing new section 923(a) "The licensing requirements of the present Federal Firearms Act, 15 U.S.C. § 903(a), are based upon dealers and manufacturers (includes importers) shipping or receiving firearms in interstate or foreign commerce. Here, the requirement is on engaging in business and would also include one engaging in such a business in intrastate commerce").

[17]    Other findings in section 901 of P.L. 90-351 include the following from section 901(a):

> "(2) that the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles without the knowledge or consent of their parents or guardians, narcotics

14

addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities, and others whose possession of such weapons is similarly contrary to the public interest) is a signficant factor in the prevalence of lawlessness and violent crime in the United States;

. . .

(4) that the acquistiion on a mail-order basis of firearms other than a rifle or shotgun by nonlicensed individuals, from a place other than their State of residence, has materially tended to thwart the effectiveness of State laws and regulations, and local ordinances;

(5) that the sale or other disposition of concealable weapons by importers, manufacturers, and dealers holding Federal licenses, to nonresidents of the State in which the licensees' places of business are located, has tended to make ineffective the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms;

(6) that there is a causal relationship between the easy availability of firearms other than a rifle or shotgun and juvenile and youthful criminal behavior, and that such firearms have been widely sold by federally licensed importers and dealers to emotionally immature, or thrill-bent juveniles and minors prone to criminal behavior;

. . .

(8) that the lack of adequate federal control over interstate and foreign commerce in highly destructive weapons (such as bazookas, mortars, antitank guns, and so forth, and destructive devices such as explosive or incendiary grenades, bombs, missiles, and so forth) has allowed such weapons and devices to fall into the hands of lawless persons, including armed groups who would supplant lawful authority, thus creating a problem of national concern; . . . ."

Findings in section 901(b) are as follows:

"(b) The Congress further hereby declares that the purpose of this title is to cope with the conditions referred to in the foregoing subsection, and that it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the

15

These Congressional findings may properly be understood as saying that federal regulation of *all* firearms dealers and manufacturers, not just those conducting an interstate business, was necessary in order to control firearms traffic "moving in or otherwise affecting interstate or foreign commerce." In *Nelson*, 458 F.2d at 559, we quoted the above set-out section 901(a)(3), and observed that "[i]f Congress is to effectively prevent the interstate use of guns for illegal purposes it must control their sources: manufacturers, dealers, and importers."[18] This reasoning from the quoted Congressional findings in support of the requirement that *all* firearms manufacturers and dealers be federally licensed is analogous to the reasoning we employed in *United States v. Lopez*, 459 F.2d 949 (5th Cir.), *cert. denied sub nom. Llerena v. United States*, 93 S.Ct. 130 (1972), in sustaining federal regulation of intrastate as well as interstate narcotics traffic. *See id.* at 951-53 (relying on express Congressional

purpose of hunting, trap shooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title."

[18] *Nelson* upheld a conviction under 18 U.S.C. § 922(a)(6) proscribing false statements to a licensed dealer in acquiring a firearm from the dealer if "material to the lawfulness of the sale" under chapter 44; the false statement was that the defendant had not been convicted of a felony, which was "material to the lawfulness of the sale" in that 18 U.S.C. § 922(d)(1) made it unlawful for a licensed dealer to sell a firearm to a felon, regardless of whether the particular sale had a nexus to interstate commerce. *Id.* at 557-58.

16

findings "that intrastate incidents of the traffic in controlled substances . . . had a substantial and direct effect on interstate commerce" and "swelled the interstate traffic in such substances," that "it was impossible to distinguish between substances manufactured and distributed intrastate from those manufactured and distributed interstate," and thus "that control of the intrastate incidents of traffic in controlled substances was essential to control of interstate incidents of that traffic").

However, it is significant that, apart from the license requirement for all firearms dealers and manufacturers, all the numerous proscriptions of chapter 44 of Title 18, as thus enacted, were expressly tied either to interstate commerce or to the regulation of the conduct of, or dealings with, federally licensed dealers, manufacturers, or importers, or to both. This was true not only for the proscriptions that were carried over from the Federal Firearms Act,[19] but also for the added proscriptions.[20]

---

[19] The Federal Firearms Act provisions against felons (or indictees or fugitives) shipping or transporting firearms in interstate commerce, 15 U.S.C. § 902(e), against felons (or fugitives) receiving any firearm "which has been shipped in interstate commerce," *id*. § 902(f), and against any person shipping or transporting stolen firearms in interstate commerce or shipping, transporting, or receiving in interstate commerce firearms with altered or obliterated serial numbers, *id*. §§ 902(g) & (i), were carried forward without alteration of the interstate nexus, though with slight other alterations, into respectively 18 U.S.C. § 922(e), 922(f) (persons under felony indictment added; presumption removed); 922(g) and 922(i) (presumption removed). The character of ammunition covered was restricted to that used in destructive devices, such as rockets, bombs, or the like. 18 U.S.C. § 921(a)(4), (16). The provision of the Federal Firearms Act against licensed dealers or manufacturers shipping or transporting in interstate commerce to other than licensed dealers or manufacturers where the recipient was required to but did not have a local license, 15 U.S.C. § 902(c), was retained but altered in 18 U.S.C. § 922(a)(2) so that

17

In Title VII of P.L. 90-351 Congress also enacted what came to be codified as 18 U.S.C. App. §§ 1201 through 1203 (now repealed). Title VII was added on the Senate floor, "hastily passed, with little discussion, no hearings, and no report," and "never received committee consideration in" either chamber. *Bass*, 92 S.Ct. at 520 & n.11. Section 1202(a) criminalized any felon (or person discharged other than honorably from the Armed Forces, or adjudged a mental incompetent, or who had renounced United States

it did not apply to rifles or shotguns but did prohibit almost all interstate shipments by licensed dealers or manufacturers to those who were not licensed dealers or manufacturers.

[20] Added Title 18 provisions with an express interstate commerce nexus include: section 922(a)(3) proscribing transportation or receipt by any non-licensee into or within his state of residence of any firearm "obtained by him outside that State" (except for a shotgun or rifle that he could lawfully possess in his state of residence); section 922(a)(4) forbidding any unlicensed person to "transport in interstate or foreign commerce" any "destructive device" (such as a bomb, missile, or rocket, section 921(a)(4)), machine gun, or "sawed off" shotgun or rifle; section 922(a)(5) forbidding transfer or delivery by a person resident in one state to a person (other than a licensed dealer or manufacturer) resident in a different state of any firearm (other than a rifle or shotgun proper under the laws of the latter state); section 924(b) denouncing whoever "ships, transports, or receives a firearm in interstate or foreign commerce" with intent to commit therewith a felony or knowing or with cause to believe a felony is to be committed therewith.
Added Title 18 provisions with an express nexus to federally licensed dealers or manufacturers include: section 922(b) proscribing firearms transfers by licensed dealers or manufacturers to minors (except for shotguns or rifles) (1), or where local law in the state of transfer forbids possession by the transferee (2), or where the transferee resides in another state (except for shotguns or rifles) (3), or of "destructive devices" (bombs, missiles, etc.) or machine guns or "sawed-off" shotguns or rifles (4), in all cases except for transfers to other licensed dealers or manufacturers; section 922(a)(6) forbidding false statements to licensed dealers in acquisition of firearms that are material to the lawfulness under chapter 44 of the acquisition; and section 922(c) forbidding transfer by a licensed dealer or manufacturer to a felon, fugitive from justice, or one under felony indictment.

citizenship, or was an alien unlawfully in the country) "who receives, possesses, or transports in commerce or affecting commerce . . . any firearm." Section 1201 contained Congressional findings "that the receipt, possession, or transportation of a firearm by felons" (and by the other categories of persons covered by section 1202(a)) "constitutes (1) a burden on commerce or threat affecting the free flow of commerce," and "a threat to the safety of the President . . . and Vice-President" and to the continued effective operation of the federal and all state governments, and "an impediment or a threat" to the exercise of First Amendment rights. In the Firearms Owners' Protection Act of 1986, P.L. 99-308, 99th Cong., 2d Sess., 104 Stat. 449, other aspects of which we consider in more detail below, *all* of Title VII (including section 1201 and all its findings) was repealed, P.L. 99-308, § 104(b), and most of the substantive provisions of Title VII (*e.g.,* §§ 1202 & 1203) were essentially incorporated into section 922. P.L. 99-308, § 102.

*Gun Control Act of 1968*

In October 1968, Congress enacted the Gun Control Act of 1968, P.L. 90-618, 90th Cong. 2d Sess., 82 Stat. 1213. Title I of this legislation reenacted all of chapter 44 of Title 18 (§§ 921-928), but with what are for present purposes essentially only minor changes from the version thereof enacted earlier that year by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968.[21]

---

[21] Title II of P.L. 90-618 amended the National Firearms Act at least in part to eliminate the Fifth Amendment self-incrimination problems that the Supreme Court had found in *Haynes*. *See* note 12, *supra*.

19

Among these changes were, for example, removal or narrowing of most of the exemptions that Title IV had made for rifles and shotguns (see note 20, *supra*, and note 23, *infra*), additional coverage of transactions in ammunition in certain instances where Title IV dealt only in firearms, and adding unlawful users of federally regulated narcotics and adjudicated mental defectives to felons, fugitives, and indictees as persons concerning whom certain firearm transactions were prohibited.[22] Title I also added certain new prohibitions on licensees, including a new section 922(c) prohibiting licensees from selling firearms to those who are not licensees unless the purchaser either appeared in person on the licensee's premises or furnished a sworn statement as to his eligibility and seven days' notice was given the chief law enforcement officer of the transferee's residence prior to delivery or shipment. Other provisions relaxed some of the restrictions of section 922(a)(3) & (5) as enacted by Title IV of P.L. 90-351.[23]

---

[22]    As enacted by Title IV of P.L. 90-351, section 922(c) prohibited a licensee from selling or disposing of a firearm to a felon, fugitive, or indictee, section 922(e) prohibited any such individual (felon, etc.) from shipping or transporting a firearm in interstate or foreign commerce and section 922(f) denounced any such individual (felon, etc.) who received any firearm that had been shipped or transported in interstate commerce. Title I of P.L. 90-618 shifted these sections to, respectively, section 922(d), (g), and (h), and added to the disqualified individuals adjudicated mental defectives and unlawful users or addicts of various federally controlled drugs. No change was made in the provisions for nexus to interstate or foreign commerce or to a federal licensee.

[23]    As enacted by P.L. 90-351, section 922(a)(3) prohibited transport or receipt by a non-licensee into or within his state of residence of any firearm (except for a shotgun or rifle he could lawfully possess in his state of residence) "obtained by him outside that state." P.L. 90-618 revised section 922(a)(3) to narrow the shotgun or rifle exception and to add an exception

20

In sum, the Gun Control Act of 1968 maintained the same essential jurisdictional bases of the earlier 1968 legislation, namely SQapart from the license requirement for all dealers and manufacturersSQ an express nexus either to interstate commerce or to the conduct of, or dealings with, federally licensed dealers or manufacturers, or to both. The legislative history is consistent with this approach.[24] The House committee report explains the purpose of the Gun Control Act of 1968 (which originated as H.R. 17735) in relevant part as follows:

"PURPOSE

The principal purpose of H.R. 17735, as amended, is to strengthen Federal controls over *inter*state and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their

---

for firearms acquired by testate or intestate succession. As enacted by P.L. 90-351, section 922(a)(5) prohibited non-licensees from transferring any firearm (other than a rifle or shotgun) to a non-licensee resident "in any State other than that in which the transferor resides." P.L. 90-618 revised section 922(a)(5) to eliminate the shotgun or rifle exception and to add exceptions for transfers by testate or intestate succession and for temporary loans "for lawful sporting purposes." In both section 922(a)(3) and section 922(a)(5) the revisions of P.L. 90-618 retained the jurisdictional basis of the prior sections, namely out-of-state acquisition or disposition to a resident of a different state.

[24] An exception to this was the addition by P.L. 90-618 of a new section 924(c) (and the concomitant renumbering of the former section 924(c)) enacted by P.L. 90-351 as section 924(d)) providing that any person who used a firearm to commit (or unlawfully carried a firearm during the commission of) "any felony which may be prosecuted in a court of the United States" "shall be sentenced to" one to ten years' imprisonment. While this did not rely for jurisdictional purposes on either interstate commerce or the involvement of a federally licensed party, it was obviously based on the same federal jurisdictional footing as that on which the underlying felony rested. See note 10, *supra*.

21

borders.

. . .

                        GENERAL STATEMENT

        The increasing rate of crime and lawlessness and the
growing use of firearms in violent crime clearly attest
to a need to strengthen Federal regulation of *inter*state
firearms traffic.

        The subject legislation responds to widespread
national concern that existing Federal control over the
sale and shipment of firearms [across] *State lines* is
grossly inadequate.

        Handguns, rifles, and shotguns have been the chosen
means to execute three-quarters of a million people in
the United States since 1900.  The use of firearms in
violent crimes continues to increase today.

. . .

        The committee is persuaded that the proposed
legislation imposes much needed restrictions on
*inter*state firearms traffic and, at the same time, does
not interfere with legitimate recreational and self-
protection uses of firearms by law-abiding citizens.  The
committee urges its enactment." H.R. Rep. No. 1577, 90th
Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 4410 at
4411-13, 4415 (emphasis added).

*Firearms Owners' Protection Act of 1986*

This basic jurisdictional structureSQthe licensing of all

firearms dealers and manufacturers, based on Congress' express

finding (in the Omnibus Crime Control and Safe Streets Act of 1968,

P.L. 90-351, § 902(a)(3)) to the effect that such was necessary to

adequate federal control of interstate and foreign commerce in

firearms, and in all other instances an express nexus either to

interstate commerce or to the activity of, or dealings with,

federally licensed dealers or manufacturers, or to both[25]SQhas

---

[25]    As observed in Note 24, *supra*, there was in section 924(c)
(using or carrying a firearm in a federal felony) the separate

continued to the present, with only a few, discrete exceptions, the first of which arose in 1986, in the Firearms Owners' Protection Act, P.L. 99-308, 99 Cong., 2d Sess., 100 Stat. 449-461.

Section 102(5)(A) of the Firearms Owners' Protection Act, 100 Stat. 451-52, amended section 922(d), as explained in the relevant committee report, "by extending the prohibition on transferring firearms to disqualified persons [*e.g.,* felons, fugitives, etc.] from only licensees to private individuals as well."  H.R. Rep. No. 99-495, 99 Cong., 2d Sess., *reprinted in* 1986 U.S.C.C.A.N. 1327 at 1341.  The explanation for this particular amendment appears in an "assessment" of the bill by the Bureau of Alcohol, Tobacco and

---

jurisdictional basis of the underlying federal offense.  In 1984, section 924(c) was amended to make the penalty additional to that for the underlying federal offense, to eliminate the element of "unlawfully" from the carrying branch of the offense, and to describe the underlying federal offense as "any crime of violence" (instead of "any felony") "for which he may be prosecuted in a court of the United States."  P.L. 98-473, § 1005, 98th Cong., 2d Sess., 98 Stat. 1837, 2138-39.  At the same time 18 U.S.C. § 929(a) was enacted providing enhanced punishment for whoever uses or carries a "handgun" loaded with "armor piercing ammunition" during or in relation to "the commission of a crime of violence . . . for which he may be prosecuted in a court of the United States."  P.L. 98-473, § 1006, 98 Stat. 2139.

In 1986, in the Firearms Owners' Protection Act, P.L. 99-308, §§ 104(a)(2) & 108, 99th Cong., 2d Sess., 100 Stat. 449, 456-57, 460, §§ 924(c) and 929(a) were amended to add to "crime of violence" any "drug trafficking crime" as occasions on which use of a firearm was prohibited; nevertheless, the offense still had to be one (as it does today) "for which he may be prosecuted in a court of the United States" (§ 924(c)(1); § 929(a)(1)). Also, "drug trafficking crime" was (and is) defined so as to limit it to federal felonies (§ 924(c)(2); § 929(a)(2)); and "crime of violence" was (and is) defined, but its definition did not itself require a federal element (§ 924(c)(3)).

Later in 1986, in P.L. 99-408, § 8, 99th Cong., 2d Sess., 100 Stat. 920, 921, the "handgun" reference in section 929(a) was changed to "firearm," but the jurisdictional basis ("for which he may be prosecuted in a court of the United States") of section 929(a) was not altered.

Firearms (BATF) that appears in full as a part of this committee report, and states "This proposal would close an existing loophole whereby qualified purchasers have acquired firearms from licensees on behalf of prohibited persons." *Id*. 1986 U.S.C.C.A.N. at 1343.[26] This amendment to section 922(d) does not render it analogous to section 992(q), which is presently before us. To begin with, section 922(d) deals with transfers, not mere possession, and, as we said in *Nelson*, "acquisition of firearms is more closely related to interstate commerce than mere possession." *Id*. 458 F.2d at 559. Moreover, the above quoted legislative history indicates that Congress determined that relegation of all transferors to disqualified persons, not just federal licensee transferors, was necessary to prevent evasion of the regulation of federal licensees (a regulation with independent legitimacy, see note 9, *supra*). This is consistent with the approach we took in *Lopez* in sustaining federal regulation of intrastate, as well as interstate, narcotics trafficking. *Id*. 459 F.2d at 951-53. *See also Nelson*, 458 F.2d at

---

[26]    This portion of the BATF assessment reads in full:

> "2. *Sales to Prohibited Persons*.  This bill makes it unlawful for any person, not only licensees, to sell or otherwise dispose of firearms to certain prohibited categories of persons, e.g., a convicted felon.  Under existing law it is only unlawful for a licensee to sell or otherwise dispose of firearms knowing or having reasonable cause to believe that such a person is in a prohibited category.  This proposal would close an existing loophole whereby qualified purchasers have acquired firearms from licensees on behalf of prohibited persons."  *Id*.

This amendment to section 922(d) also added to the list of disqualified persons illegal aliens and those who had been dishonorably discharged or had renounced United States citizenship.

559 (relying on Congressional finding in P.L. 90-351, § 901(a)(3), and observing that "[i]f Congress is to effectively prevent the interstate use of guns for illegal purposes it must control their sources: manufacturers, dealers and importers"). Finally, the overall structure and history, as well as the title, of the Firearms Owners' Protection Act suggest no Congressional determination that mere possession of ordinary firearms implicates interstate commerce or other federal concerns. Indeed, Congress in that legislation expressly found, *inter alia*, "that (1) the rights of citizensSQ(A) to keep and bear arms under the second amendment to the United States Constitution; . . .; and (D) against unconstitutional exercise of authority under the ninth and tenth amendments; require additional legislation to correct existing firearms statutes and enforcement policies." P.L. 99-308 § 1(b).[27]

---

[27] The full text of P.L. 99-308 § 1, 100 Stat. 449, is as follows:

> "(a) SHORT TITLE.SQThis Act may be cited as the 'Firearms Owners' Protection Act'.
> (b) CONGRESSIONAL FINDINGS.SQThe Congress finds thatSQ
> > (1) the rights of citizensSQ
> > > (A) to keep and bear arms under the second amendment to the United States Constitution;
> > > (B) to security against illegal and unreasonable searches and seizures under the fourth amendment;
> > > (C) against uncompensated taking of property, double jeopardy, and assurance of due process of law under the fifth amendment; and
> > > (D) against unconstitutional exercise of authority under the ninth and tenth amendments;
> > require additional legislation to correct existing firearms statutes and enforcement

Further, this legislation amended several provisions of section 922 and section 924 that contained express interstate commerce nexus requirements without diluting those requirements. This was true, for example, with respect to the amendments to section 922(g), prohibiting felons (and other disqualified persons) from shipping or transporting any firearms "in interstate or foreign commerce," from receiving any firearm "which has been shipped or transported in interstate or foreign commerce" and, as added by the amendment, from possessing any firearm "in or affecting commerce." P.L. 99-308 § 102(6). As we explained in *Wallace*, 889 F.2d at 583, the legislative history of this amendment clearly showed that the phrase "in or affecting commerce" meant "interstate" commerce, and that accordingly the possession offense of thus amended section 922(g) "reaches *only* those firearms that traveled in interstate or foreign commerce and is *thus* constitutional." (Emphasis added). Similarly, the legislation enacted a new section 922(n), P.L. 99-308 § 102(8), which proscribed those under felony indictmentSQwhom the same legislation

policies; and
(2) additional legislation is required to reaffirm the intent of the Congress, as expressed in section 101 of the Gun Control Act of 1968, that 'it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap-shooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes'."

26

removed from sections 922(g) and (h)SQfrom shipping or transporting any firearm "in interstate or foreign commerce" and from receiving any firearm "which has been shipped or transported in interstate or foreign commerce."[28] Also, the express federal nexus was retained where the Firearms Owners' Protection Act amended sections 924(c) and 929(a) to add "drug trafficking crime" to the offenses concerning which firearm (or certain ammunition) use was proscribed, while retaining the requirement that the offense in any event be one that could "be prosecuted in a court of the United States." See note 25, *supra*. Similarly, the amendment made to section 922(a)(3), concerning a non-licensee's transportation into or receipt within his state of residence of a firearm "obtained by such person outside that state" broadened to all types of firearms an exception previously limited to shotguns and rifles, but retained the "obtained by such person outside that state" language. P.L. 99-308 § 102(3). Likewise, the restriction on licensed dealer sales to non-residents of the state of the licensee's business location was amended but without altering the interstate character of the subject matter. *Id*. § 102(4). And, the legislation left unchanged other provisions of section 922 expressly requiring an interstate commerce nexus, such as, for example, section 922(a)(5), generally prohibiting non-licensee transfers of firearms to other

---

[28] As previously observed, these amendments repealed former 18 U.S.C. § 1202 and incorporated the provisions of former section 1202 into sections 922(g) and (n). Prior to the amendment, sections 922(g) and (h) had not applied to possession as such, but had included those under felony indictment, while section 1202(a) included possession "in commerce or affecting commerce" but did not include those under felony indictment.

27

non-licensees residing in a state other than that of the transferor's residence.

The other Firearms Owners' Protection Act change relevant in this connection is its section 102(9), 100 Stat. 452-53, adding a new section 922(o) making it unlawful for "any person to transfer or possess a machine gun" except for any "lawfully possessed before the date this subsection takes effect." There is no committee report, and sparse legislative history, concerning this provision, as it was added on the House floor. The only apparent explanation for it is the statement of its sponsor, Representative Hughes, that "I do not know why anyone would object to the banning of machine guns." *See Farmer v. Higgins*, 907 F.2d 1041, 1044-45 (11th Cir. 1990). While section 922(o) is a closer parallel than others to section 922(q) presently before us, as both sections denounce mere possession with no express tie either to interstate commerce or other federalizing element, we decline to read into section 922(o) any implied Congressional determination that possession of firearms generally, or within one thousand feet of any school grounds, affects interstate commerce. Section 922(o) is restricted to a narrow class of highly destructive, sophisticated weapons that have been either manufactured or imported *after* enactment of the Firearms Owners' Protection Act,[29] which is more suggestive of a nexus to or affect on interstate or foreign commerce than

---

[29] The grandfather clause in section 922(o)(2)(B) applies only to machine guns "lawfully" possessed before enactment; nevertheless, with respect to those possessed earlier but unlawfully there would be a jurisdictional nexus in the federal law making that earlier possession unlawful, such as the National Firearms Act or various provisions of chapter 44 of Title 18.

possession of any firearms whatever, no matter when or where originated, within one thousand feet of the grounds of any school.

The only two circuit courts that have addressed a constitutional challenge to section 922(o), *United States v. Hale*, 978 F.2d 1016, 1018 (8th Cir. 1992), *cert. denied*, 113 S.Ct. 1614 (1993); *United States v. Evans*, 928 F.2d 858 (9th Cir. 1991), have sustained it in reliance on Congressional findings that appear to us to be inapplicable in the present context, whatever relevance they might have to section 922(o).[30]  *Hale* states that, "The legislative history of section 922(o) indicates that Congress considered the relationship between the availability of machine guns, violent crime, and narcotics trafficking.  *See* H.R. Rep. No. 495, 99th Cong., 2d Sess., at 1-5, *reprinted in* 1986 U.S.C.C.A.N. 1327, 1327-31."  *Id*. at 1018.  The only portion of the cited passage of the H.R. Rep. No. 495 that relates to machine gunsSQand it will be recalled that neither section 922(o) nor anything comparable to it was included in the bill (H.R. 4332) there being consideredSQis a discussion of the history of the legislation, including various earlier bills that did not become law.  One of the earlier bills discussed was H.R. 3135, introduced August 1, 1985, and H.R. Rep. No. 495 observes that H.R. 3135 "prohibited the transfer and possession of machine guns, used by racketeers and drug traffickers for intimidation, murder and protection of drugs and the proceeds of crime.  The bill allowed possessors of lawfully registered machine guns to continue their lawful possession."  1986

---

[30]     *Farmer* did not address the validity of section 922(o).

U.S.C.C.A.N. at 1330.  Whatever this may say about machine guns, it says nothing about the mere possession of ordinary firearms.  Given the formal Congressional findings contained in the Firearms Owners' Protection Act (see note 27, *supra*), which avow a purpose to enhance Second and Tenth Amendment rights and express solicitude for the freedom of citizens to possess ordinary firearms, it would be entirely inappropriate to consider the above-quoted portions of the committee report as having any relevance beyond machine guns and similar destructive weapons.[31]

---

[31]    *Hale* also states:  "When it first enacted section 922, Congress found facts indicating a nexus between the regulation of firearms and the commerce power.  *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. No. 90-351, 82 Stat. 197, 225 (1968)."  *Id*. 978 F.2d at 1018.  The citation given is to the findings in section 901(a) of P.L. 90-351, in connection with Title IV thereof.  As previously discussed, those findings (set out in note 17 and accompanying text, *supra*), and that enactment, with one exception, do no more than speak to the need to regulate both interstate (and foreign) commerce in firearms and federally licensed dealers; the one exception is the finding that for *this* purpose it is necessary to require intrastate, as well as interstate, dealers to be federally licensed.  There is nothing to suggest any finding that mere private party *intra*state possession of firearms that have not moved in interstate commerce has any effect on interstate commerce or must be regulated in order to effectively regulate interstate commerce.
      In *Evans* the court stated:

      "Congress specifically found that at least 750,000
      people had been killed in the United States by firearms
      between the turn of the century and the time of the
      Act's enactment.  It was thus reasonable for Congress
      to conclude that the possession of firearms affects the
      national economy, if only through the insurance
      industry.  Since Evans does not contend that any
      specific Constitutional rights are implicated, this
      rather tenuous nexus between the activity regulated and
      interstate commerce is sufficient."  *Id*. 928 F.2d at
      862.

The Congressional finding alluded to is not contained in the Firearms Owners' Protection Act, and the only similar finding we can locate is that contained in H.Rep. No. 1577 in reference to

30

Section 922(o) is not before us, and we intimate no views as to it. However, we do not regard *Hale* and *Evans* as persuasive respecting either the validity of section 922(q) or the existence of express or implied Congressional findings supportive thereof.

*The Undetectable Firearms Act of 1988*

We note two firearms provisions enacted in 1988. The Undetectable Firearms Act of 1988, P.L. 100-649, 100th Cong., 2d Sess., 102 Stat. 3816, added to Title 18 § 922(p) making it unlawful for any person to "manufacture, import, ship, deliver, possess, transfer, or receive" any firearms either not as detectable "by walk-through metal detectors" as an exemplar to be developed by the Secretary of the Treasury or which "when subjected to inspection by the type of x-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of" any major component thereof. Section 922(p)(1).

---

H.R. 17735, which became the Gun Control Act of 1968. See H.Rep. No. 1577, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 4410 at 4411-15. We have quoted this language in the text, *supra*, in our discussion of that legislation. Nothing in this committee report mentions insurance or suggests that mere *intra*state possession of firearms that have not moved in interstate commerce has any affect on interstate commerce or must be regulated in order to effectively regulate interstate commerce. The committee states that "the proposed legislation imposes much needed restrictions on *inter*state firearms traffic," *id*. at 4415 (emphasis added), and that there is "a need to strengthen Federal regulation of *inter*state firearms traffic." *Id*. at 4412 (emphasis added). This is consistent with what the legislation did, and it did not (apart from continuing the requirement of the Omnibus Crime Control and Safe Streets Act that intrastate, as well as interstate, dealers be federally licensed) purport to regulate mere private party possession of firearms that had not moved in interstate commerce.

We thus disagree with the general statements in *Hale* and *Evans* respecting the Omnibus Crime Control and Safe Streets Act of 1968 and the Gun Control Act of 1968.

Exempted were "any firearm manufactured in, imported into, or possessed in the United States before the date of the enactment" of the act. Section 922(p)(6). Although there is no express requirement of an interstate nexus for the section 922(p) possession offense, we reject the government's argument that this legislation is analogous to section 922(q). Section 922(p)'s employment of the standard of "x-ray machines commonly used at airports" plainly reflects the act's interstate commerce related purpose and nexus. This is confirmed by the legislative history, as the relevant committee report notes "the threat posed by firearms which could avoid detection at security checkpoints: airports, government buildings, prisons, courthouses, the White House." H.R. Rep. No. 100-612, 100th Cong., 2d Sess., *reprinted in* 1988 U.S.C.C.A.N. 5359.[32]

*Anti-Drug Abuse Amendments Act of 1988*

The other 1988 firearms legislation is subtitle G (§§ 6211-6215) of Title VI ("Anti-Drug Abuse Amendments Act of 1988") of the Anti-Drug Abuse Act of 1988, P.L. 100-690, 100th Cong., 2d Sess., 102 Stat. 4181, 4359-62. Subtitle G added to Title 18 sections 924(f) and (g) and 930. P.L. 100-960, §§ 6211, 6215. Section 924(g) denounces "[w]hoever knowingly transfers a firearm, knowing that such firearm will be used to commit a crime of violence (as

_____

[32] Moreover, section 922(p) applies only to nondetectable firearms manufactured in or imported into the United States after its November 10, 1988, enactment, which is suggestive of a closer relation to commerce than mere possession of any firearm whenever and wherever made. Section 922(p)(6). The cited committee report also observes that "No firearms currently manufactured in the United States are known to be subject to the proposed prohibitions." *Id.* 1988 U.S.C.C.A.N. 5359 at 5363.

defined in subsection (c)(3)) or drug trafficking crime (as defined in subsection (c)(2))."  There is no requirement that the transfers have an interstate character or that the firearms have been in interstate commerce.  While "drug trafficking crime" is limited to federal offensesSQand this limitation was maintained even though the same legislation slightly amended the definition thereof in section 924(c)92) and section 929(a)(2)[33]SQ"crime of violence" is not so limited.  Section 924(c)(3).  Our attention has not been called to legislative history suggesting an explanation for this seeming anomaly.[34]  It seems anomalous in several respects.

There is no apparent reason why the drug trafficking crime must be federal, but not the crime of violence.  Further, no amendment was made to section 924(b), denouncing the shipment, transport, or receipt of a firearm "in interstate or foreign commerce" with "knowledge or reasonable cause to believe that" a felony "is to be committed therewith"; nor to section 924(c)(1) denouncing use or carrying of a firearm during or in relation to "any crime of violence or drug trafficking crime . . . for which he

---

[33]    P.L. 100-690, § 6212, 102 Stat. 4360.

[34]    The 1988 U.S.C.C.A.N. states respecting the Anti-Drug Abuse Act of 1988 that "No Senate or House Report was submitted with this legislation."  *Id*. at 5937.  New section 924(g) was applied in a "crime of violence" context in *United States v. Callaway*, 938 F.2d 907 (8th Cir. 1991), which observes that it "was designed to curb the supply of firearms used in the commission of drug related and violent crimes," but cites no legislative history.  *Id*. at 909.  *Callaway* does not address the validity of section 924(g), its relationship to the regulation of interstate commerce, or any express or implied Congressional findings related thereto, nor whether the offense there had an interstate or other jurisdictional nexus (though the facts recited suggest none).

may be prosecuted in a court of the United States."[35]  The seemingly unusual result is that anyone who transfers intrastate a firearm (which has not been in interstate commerce) knowing it will be used in a crime of violence in that state commits a federal crime even though the crime of violence is not a federal offense, but the party perpetrating the crime of violence with the firearm in that same state violates federal law *only* if the crime of violence is one "for which he may be prosecuted in a court of the United States."  A possible inference from this is that transfer is deemed more related to the regulation of interstate commerce than mere use or possession.  *Cf*. *Nelson*, 458 F.2d at 559 ("acquisition of firearms is more closely related to interstate commerce than mere possession").[36]

The 1988 legislation, like that before it, demonstrates neither a pattern of regulation that abjures any express nexus to interstate commerce or other federal element nor any express or implied Congressional finding about mere possession of ordinary

---

[35]    Nor to section 929(a)(1) denouncing possession of armor piercing ammunition during or in relation to "a crime of violence or drug trafficking crime . . . for which he may be prosecuted in a court of the United States."

[36]    We also observe that the other additions to chapter 44 of Title 18 made by subtitle G of Title VI of the Anti-Drug Abuse Act of 1988 expressly provided for an interstate commerce or other federal nexus.  Thus, new section 924(f), P.L. 100-960, § 6211, 102 Stat. 4359, denounces whoever "travels from any State or foreign country into any other State" and acquires or transfers "a firearm in such other State" with the purpose of engaging in conduct constituting any of various offenses including "a crime of violence (as defined in subsection (c)(3))."  New section 930, P.L. 100-960, § 6215, 102 Stat. 4361, denounces "whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility."

34

firearms absent such a nexus.

*Crime Control Act of 1990*

At long last, we turn to the Crime Control Act of 1990, P.L. 101-647, 101st Cong., 2d Sess., 104 Stat. 4789-4968, which included, as part of its XVII ("General Provisions"), section 1702, 104 Stat. 9844-45, the Gun-Free School Zone Act of 1990, that enacted the new section 922(q).[37] Preliminarily, we note that the Crime Control Act of 1990 also contained a Title XXII ("Firearms Provisions"), P.L. 101-647, § 2201-2205, 104 Stat. 4856-58, which revised other portions of chapter 44 of Title 18. These other revisions all retained or provided for an express interstate commerce (or other federal jurisdiction) nexus for the various Title 18, chapter 44, offenses the provisions of which were being amended.[38]

---

[37] Section 1702 also added to section 921(a) new subsections (25), (26), and (27) defining terms used in new section 922(q) ("school zone," "school," and "motor vehicle") and added to section 924(a) new subsection (4) fixing the penalty for violation of new section 922(q).

[38] Public Law 101-647 § 2201 amended section 922(a)(5), which formerly proscribed (with exceptions) transfer of a firearm by a nonlicensee to a nonlicensee who "resides in any state other than that in which the transferor resides" (or that in which the place of business of the transferor, if a business entity, is located) so that it proscribed (with the same exceptions) such a transfer if the nonlicensee transferee "does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the transferor resides." The purpose of this was apparently to include among disqualified transferees "an alien or transient who does not reside in the State in which the transferor resides." H.Rep. No. 101-681(I), 101st Cong., 2d Sess., at 106, *reprinted in* 1990 U.S.C.C.A.N. 6472 at 6510. It also appears to have the effect of clarifying section 922(a)(5) by removing its otherwise arguable prohibition of transfer to a nonlicensee business entity having a place of business in the transferor's state of residence but existing under the laws of and having its principal place of

*Gun-Free School Zones Act of 1990*

The Gun-Free School Zones Act of 1990, now section 922(q), was introduced in the Senate by Senator Herbert Kohl as S. 2070 and a virtually identical bill with the same title was introduced in House by Representative Edward Feighan as H.R. 3757. The Senate version was eventually enacted as part of Title XVII of the Crime Control Act of 1990, P.L. 101-647 § 1702, 104 Stat. 4844-45. The House Report accompanying the Crime Control Act broadly declares that the intent of the Crime Control Act was "to provide a legislative response to various aspects of the problem of crime in

---

business in a different state.

Also, Public Law 101-647 § 2202(a) amended section 922(j), which prohibited any person from receiving, concealing, disposing of, pledging, or accepting as security any stolen firearm "moving as, which is a part of, or which constitutes, interstate or foreign commerce," by expanding it to also cover any stolen firearm "which has been shipped or transported in, interstate or foreign commerce." H.Rep. No. 101-681(i), *supra*, explains that the amendment will "permit prosecution . . . where the firearms have already moved in interstate or foreign commerce." *Id*. at 106, 1990 U.S.C.C.A.N. at 6510.

Further, Public Law 101-647 § 2202(b) amended section 922(k), which made it unlawful "to transport, ship or receive, in interstate or foreign commerce" any firearm whose serial number had been removed, altered, or obliterated, by expanding it to also make it unlawful "to possess or receive" any such firearm that "has, at any time, been shipped or transported in interstate or foreign commerce."

And, Section 2204 of P.L. 101-647 added section 922(r) making it "unlawful for any person to assemble from imported parts" any rifle or shotgun "identical" to any "prohibited from importation under section 925(d)(3)." House Report 101-68(I), *supra*, reflects that this amendment "is to prevent the circumvention of the importation restrictions by persons who would simply import the firearms in a disassembled form and then reassemble them in the United States." *Id*. at 107, 1990 U.S.C.C.A.N. at 6511.

Finally, section 2205 of P.L. 101-647 amended section 930, which denounced possession of firearms "in a Federal facility," so that an enhanced penalty would be applicable if the possession were "in a Federal court facility."

the United States."  H.R. Rep. No. 101-681(I), 101st Cong., 2d Sess. 69 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6473. However, this report makes no mention whatsoever of the impact upon commerce of firearms in schools.  Nor does the report even mention the Gun-Free School Zones Act.  Although S. 2070 has no formal legislative history that we know of, a House subcommittee hearing was held on H.R. 3757.  Witnesses told this subcommittee of tragic instances of gun violence in our schools, but there was no testimony concerning the effect of such violence upon interstate commerce.  Indeed, the noticeable absence of any attempt by Congress to link the Gun-Free School Zones Act to commerce prompted the Chief of the Firearms Division of the BATF and the BATF's Deputy Chief Counsel, to testify as follows:

> "Finally, we would note that the source of constitutional authority to enact the legislation is not manifest on the face of the bill.  By contrast, when Congress first enacted the prohibitions against possession of firearms by felons, mental incompetents and others, the legislation contained specific findings relating to the Commerce Clause and other constitutional bases, and the unlawful acts specifically included a commerce element." *Gun-Free School Zones Act of 1990:* Hearings on H.R. 3757 Before the Subcomm. on Crime of the House Comm. on the Judiciary, 101st Cong., 2d Sess., at 10 (1990) (statement of Richard Cook and Bradley Buckles) (hereinafter, House Hearings).

Although both the House and Senate sponsors of the Gun-Free School Zones Act made fairly lengthy floor statements about it, neither congressman had anything to say about commerce in their remarks. *See* 136 Cong. Rec. S17595 (1990) (statement of Sen. Kohl); 136 Cong. Rec. S766 (1990) (same); 135 Cong. Rec. E3988 (1989) (inserted statement of Rep. Feighan).

The failure of section 922(q) to honor the traditional

37

division of functions between the Federal Government and the States was commented upon by President Bush when he signed the Crime Control Act of 1990:

> "I am also disturbed by provisions in S. 3266 that unnecessarily constrain the discretion of State and local governments.  Examples are found in Title VIII's 'rural drug enforcement' program; in Title XV's 'drug-free school zones' program; and in Title XVIII's program for 'correctional options incentives.'  *Most egregiously, section 1702 inappropriately overrides legitimate State firearms laws with a new and unnecessary Federal law.*  The policies reflected in these provisions could legitimately be adopted by the States, but they should not be imposed on the States by the Congress."  Statement by President George Bush upon Signing S. 3266, 26 Weekly Comp. Pres. Doc. 1944 (Dec. 3, 1990), *reprinted in* 1990 U.S.C.C.A.N. 6696-1 (emphasis added).[39]

---

[39]    Rep. William Hughes, the Chairman of the Subcommittee on Crime of the House Judiciary Committee, made the same point in a colloquy with Richard Cook, the Chief of the BATF's Firearms Division, during the hearings on H.R. 3757:

> "Mr. Hughes.  This would be a major change, would it not, in Federal jurisdiction, in that basically, we've played a supportive role in endorsement of gun laws throughout the country, supportive of local and State efforts to attempt to license and, as a matter of fact, to restrict and punish.  This would, it seems to me, put us in the position of, for the first time, playing a direct role in the enforcement of a particular Federal lawSQa gun lawSQat the local level, the school district level.
> Mr. Cook.  ATF has always been involved with supporting State and local people in their prosecutions.
> Mr. Hughes.  I say that's been our roleSQas supportive.  Does this give us the original jurisdiction?
> Mr. Cook.  In this particular instance, this legislation would give us original Federal jurisdiction, which wouldSQ
> Mr. Hughes: That would be a major departure from basically what has been the practice of the past.
> Mr. Cook.  As far as schools as concerned, yes, it is.
> Mr. Hughes.  A major departure from a traditional federalism concept which basically defers to State and local units of government to enforce their laws.

## Commerce Power

We are, of course, fully cognizant and respectful of the great scope of the commerce power. It is generally agreed that in a series of decisions culminating in *Wickard v. Filburn*, 63 S.Ct. 82 (1942), the Supreme Court fixed the modern definition of the commerce power, returning it to the breadth of *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). As stated in one treatise:

> "After *Wickard*, the tests for proper exercise of the commerce power were settled. First, Congress could set the terms for the interstate transportation of persons, products, or services, even if this constituted prohibition or indirect regulation of single state activities. Second, Congress could regulate intrastate activities that had a close and substantial relationship to interstate commerce; this relationship could be established by congressional views of the economic effect of this type of activity. Third, Congress could regulate SQunder a combined commerce clause-necessary and proper clause analysisSQintrastate activities in order to effectuate its regulation of interstate commerce." Rotunda & Nowack, *Treatise on Constitutional Law; Substance and Procedure 2nd*, § 4.9 at 404-5.

Board as the commerce power is, its scope is not unlimited, particularly where intrastate activities are concerned. As the Court said in *Maryland v. Wirtz*, 88 S.Ct. 2017, 2024 (1968):

> "This Court has always recognized that the power to regulate commerce, though broad indeed, has limits. Mr. Chief Justice Marshall paused to recognize those limits in the course of the opinion that first staked out the vast expanse of federal authority over the economic life of the new Nation. Gibbons v. Ogden, 9 Wheat. 1, 194-195, 6 L.Ed. 23.

Chief Justice Marshall explained in *Gibbons v. Ogden*:

> "The subject to which power is next applied, is to commerce 'among the several states.'. . . Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more states

---

Mr. Cook. Yes." House Hearings, *supra*, at 14.

than one. . . . [T]he enumeration of the particular classes of commerce to which the power was to be extended, would not have been made had the intention been to extend the power to every description. The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a state. The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns which affect the states generally; but not to those which are completely within a particular state, which do not affect other states, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government. The completely internal commerce of a state, then, may be considered as reserved for the state itself." *Id.*, 9 Wheat. at 194-95, 6 L.Ed. at 69-70.

Similarly, in *Wickard v. Filburn*, the Court stated:

"But even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a *substantial economic effect on interstate commerce* and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect.'" *Id.*, 63 S.Ct. at 89 (emphasis added).

This passage has been quoted with approval many times. *See, e.g., Katzenbach v. McClung*, 85 S.Ct. 377, 383 (1964); *Perez v. United States*, 91 S.Ct. 1357, 1360 (1971). In *United States v. American Building Maintenance Industries*, 95 S.Ct. 2150, 2156 (1975), the Court speaks of the "full Commerce Clause power" as extending to "all activity *substantially* affecting interstate commerce" (emphasis added). Analogously, in *United States v. Wrightwood Dairy Co.*, 62 S.Ct. 523, 526 (1942), Chief Justice Stone's opinion for a unanimous Court states that the commerce power "extends to those intrastate activities which *in a substantial way* interfere with or obstruct the exercise of the granted power" (emphasis

40

added).[40]  Justice Harlan, writing for the Court in *Maryland v. Wirtz*, made the message explicit:  "Neither here nor in *Wickard [v. Filburn]* has the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities."  *Id.*, 88 S.Ct. at 2024 n.27.  Indeed, it could not be otherwise as the chain of causation is virtually infinite, and hence there is no private activity, no matter how local and insignificant, the ripple effect from which is not in some theoretical measure ultimately felt beyond the borders of the state in which it took place.  Hence, if the reach of the commerce power to local activity  that merely affects interstate commerce or its regulation is not understood as being limited by some concept such as "substantially" affects, then, contrary to *Gibbons v. Ogden*, the scope of the Commerce Clause would be unlimited, it would extend "to every description" of commerce and there would be no "exclusively internal commerce of a state" the existence of which the Commerce Clause itself "presupposes" and the regulation of which it "reserved for the state itself."

We recognize, of course, that the imprecise and matter of degree nature of concepts such as "substantially," especially as applied to effect on interstate commerce, generally renders decision making in this area peculiarly within the province of

---

[40]    *See also Heart of Atlanta Motel, Inc. v. United States*, 85 S.Ct. 348 (1964), where the Court noted that the "discriminatory practices" the regulation of which it sustained were "now found *substantially* to affect interstate commerce," *id.* at 355 (emphasis added), and that under the Commerce Clause Congress' regulatory powers extend to "local activities . . . which might have a *substantial* and harmful effect upon" interstate "commerce."  *Id.* at 358 (emphasis added).

Congress, rather than the Courts. And, the Supreme Court has consistently deferred to Congressional findings in this respect, both formal findings in the legislation itself and findings that can be inferred from committee reports, testimony before Congress, or statutory terms expressly providing for some nexus to interstate commerce. Relatively recent examples of statutes upheld against Commerce Clause attacks on the basis of formal Congressional findings include *EEOC v. Wyoming*, 103 S.Ct. 1054, 1058 & n.3 (1983) (Age Discrimination in Employment Act); *FERC v. Mississippi*, 102 S.Ct. 2126, 2135 (1982) (Public Utility Regulatory Policies Act); *Hodel v. Virginia Surface Mining*, 101 S.Ct. 2352, 2361 (1981) (Surface Mining Control and Reclamation Act); *Perez*, 91 S.Ct. at 1358 n.1, 1362 (Consumer Credit Protection Act).[41] In other cases, the Court has looked to the legislative history and the terms of the challenged statute itself to identify and sustain findings of a sufficient effect on interstate commerce. For example, in *McClung* the Court upheld section 201(b)(2) and (c) of Title II of the Civil Rights Act of 1964, the terms of which covered any restaurants "if their operations affect commerce" and presumed that any did "'if . . . it serves or offers to serve interstate

---

[41] *Perez* does contain the statement that: "We have mentioned in detail the economic, financial, and social setting of the problem as revealed to Congress. We do so not to infer that Congress need make particularized findings in order to legislate." *Id*. at 1362. No citation of authority is given, nor is the meaning of the second sentence entirely clear. However, the opinion as a whole shows extensive consideration of and reliance on not only the evidence before Congress and the legislative history, but also the formal Congressional findings, which the Court had already observed were "quite adequate" to sustain the act. *Id*.

42

travelers or a substantial portion of the food which it serves . . . has moved in commerce.'" *Id*. at 381.  In so ruling, despite the absence of "formal findings," the Court relied on the wording of the statute itself, which amounted to an express finding of the requisite effect on commerce under certain facts, and on the legislative history showing the extensive evidence before Congress implicating interstate commerce.  Thus the Court noted that

> "The record is replete with testimony of the burdens placed on interstate commerce by racial discrimination in restaurants. . . .  Moreover, there was an impressive array of testimony that discrimination in restaurants had a direct and highly restrictive effect upon interstate travel by Negroes."  *Id*. at 381.

> "We believe that this testimony afforded ample basis for the conclusion that established restaurants in such areas sold less interstate goods because of the discrimination, that interstate travel was obstructed directly by it, that business in general suffered and that many new businesses refrained from establishing there as a result of it."  *Id*. at 382.

> ". . . Congress has determined for itself that refusals of service to Negroes have imposed burdens both upon the interstate flow of food and upon the movement of products generally."  *Id*. at 383.

In sustaining the statute the Court concluded by stating:

> "The appellees urge that Congress, in passing the Fair Labor Standards Act and the National Labor Relations Act, made specific findings which were embodied in those statutes.  Here, of course, Congress has included no formal findings.  But their absence is not fatal to the validity of the statute, [citation omitted] for the evidence presented at the hearings fully indicated the nature and effect of the burdens on commerce which Congress meant to alleviate.

> "Confronted as we are with the facts laid before Congress, we must conclude that it had a rational basis for finding that racial discrimination in restaurants had a direct and adverse effect on the free flow of interstate commerce.  Insofar as the sections of the Act here relevant are concerned, §§ 201(b)(2) and (c), Congress prohibited discrimination only in those

43

establishments having a close tie to interstate commerce, *i.e.,* those, like the McClungs', serving food that has come from out of the State.  We think in so doing that Congress acted well within its power to protect and foster commerce in extending the coverage of Title II only to those restaurants offering to serve interstate travelers or serving food, a substantial portion of which has moved in interstate commerce."  *Id*. at 384 (footnote omitted).[42]

Where Congress has made findings, formal or informal, that regulated activity substantially affects interstate commerce, the courts must defer "if there is any rational basis for" the finding. *Preseault v. I.C.C.*, 110 S.Ct. 914, 924 (1990); *Hodel v. Virginia Surface Mining and Reclamation Association, Inc*., 101 S.Ct. 2352, 2360 (1981); *Heart of Atlanta Motel, Inc. v. United States*, 85

---

[42]     Similarly, in *Heart of Atlanta Motel, Inc. v. United States*, 85 S.Ct. 348 (1964), the Court upheld the same act "as applied here to a motel which concededly serves interstate travelers." *Id.* at 360.  The Court noted that the act, by its express terms, applied to an establishment "if its operations affect commerce," which was defined to include "any inn, hotel, motel, or other establishment which provides lodging to transient guests." *Id*. at 352-53.  It observed that statute was "carefully limited to enterprises having a direct and substantial relation to the interstate flow of goods and people, except where state action is involved." *Id*. at 355.  In sustaining the act as applied the Court stated:

> "While the Act as adopted carried no congressional findings the record of its passage through each house is replete with evidence of the burdens that discrimination by race or color places upon interstate commerce.  See Hearings before Senate Committee on Commerce on S. 1732, 88th Cong., 1st Sess.; S.Rep. No. 872, supra; Hearings before Senate Committee on the Judiciary on S. 1731, 88th Cong., 1st Sess.; Hearings before House Subcommittee No. 5 of the Committee on the Judiciary on miscellaneous proposals regarding Civil Rights, 88th Cong., 1st Sess., ser. 4; H.R.Rep. No. 914, supra. . . .  We shall not burden this opinion with further details since the voluminous testimony presents overwhelming evidence that discrimination by hotels and motels impedes interstate travel" *Id*. at 355.

S.Ct. 348, 358 (1964); *McClung*, 85 S.Ct. at 383. Practically speaking, such findings almost always end the matter.[43] This means that the states, and the people, must largely look to their representatives in Congress to fairly and consciously fix, rather than to simply disregard, the Constitution's boundary line between "the completely internal commerce of a state . . . reserved for the state itself" and the power to regulate "Commerce with foreign Nations, and among the several States." Courts cannot properly perform their duty to determine if there is any rational basis for a Congressional finding if neither the legislative history nor the statute itself reveals any such relevant finding.[44] And, in such a situation there is nothing to indicate that Congress itself consciously fixed, as opposed to simply disregarded, the boundary line between the commerce power and the reserved power of the states. Indeed, as in this case, there is no substantial indication that the commerce power was even invoked.[45]

---

[43] We know of no Supreme Court decision in the last half century that has set aside such a finding as without rational basis. However, the Court has never renounced responsibility to invalidate legislation as beyond the scope of the Commerce Clause. *See, e.g., Maryland v. Wirtz*, 88 S.Ct. 2017, 2025 (1968) ("This Court has examined and will continue to examine federal statutes to determine whether there is a rational basis for regarding them as regulations of commerce among the states."). Nor may we renounce that duty.

[44] Conceivably, a purely informational void could be filled by evidence in court of the same general kind that might have been presented to a Congressional committee or the like concerning any relationship between the legislation and interstate commerce. However, in such a situation the court could only guess at what Congress' determination would have been. In any event, there is no such evidence here.

[45] We recognize that "the constitutionality of action taken by Congress does not depend on recitals of the power which it

45

Congressional enactments are, of course, presumed constitutional. But in certain areas the presumption has less force. *Cf. United States v. Carolene Products Co.*, 58 S.Ct. 778, 783 n.4 (1938) ("There may be a narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments . . . ."). Here the question is essentially a jurisdictional one, and any expansion of federal power is at the expense of the powers reserved to the states by the Tenth Amendment, which is, after all, as much a part of the Bill of Rights as the First.[46] Both the management of education, and the general control of simple firearms possession by ordinary citizens, have traditionally been a state responsibility, and section 922(q) indisputably represents a singular incursion by the Federal

___

undertakes to exercise." *Woods v. Cloyd W. Miller Co.*, 68 S.Ct. 421, 424 (1948). But in that case, the Court went on immediately to say: "Here it is plain from the legislative history that Congress was invoking its war power to cope with a current condition of which the war was a direct and immediate cause." *Id.* (footnote omitted). *See also id*. at 423 ("The legislative history of the present Act makes absolutely clear that there has not yet been eliminated the deficit in housing which in considerable measure was caused by the heavy demobilization of veterans and by the cessation or reduction in residential construction during the period of hostilities due to the allocation of building materials to military projects"; footnote omitted). The Court proceeded to sustain the legislation under the war power. Here, by contrast, the legislative history does not show that Congress, in enacting the Gun-Free School Zones Act, was invoking the Commerce Clause.

[46] It is also conceivable that some applications of section 922(q) might raise Second Amendment concerns. Lopez does not raise the Second Amendment and thus we do not now consider it. Nevertheless, this orphan of the Bill of Rights may be something of a brooding omnipresence here. For an argument that the Second Amendment should be taken seriously, see Levinson, *The Embarrassing Second Amendment*, 99 Yale L.J. 637 (1989).

46

Government into territory long occupied by the States.  In such a situation where we are faced with competing constitutional concerns, the importance of Congressional findings is surely enhanced.[47]

---

[47]     As we have observed (note 42, *supra*), in *Heart of Atlanta Motel, Inc. v. United States*, 85 S.Ct. 348 (1964), the Court upheld section 201(b)(1) & (c) of Title II of the Civil Rights Act of 1964, respecting hotels, motels, and inns, as a proper exercise of the commerce power, relying on the wording of the statute and its legislative history.  The Court distinguished the *Civil Rights Cases*, 3 S.Ct. 18 (1883), which had stricken down the Civil Rights Act of 1875.  The *Heart of Atlanta* opinion observes that the opinion in *Civil Rights Cases* "specifically . . . note[d] that the Act was not conceived in terms of the commerce power."  *Heart of Atlanta*, 85 S.Ct. at 354.  The *Heart of Atlanta* opinion also in this connection contrasts the 1875 and 1964 acts:

> "Unlike Title II of the present legislation, the 1875 Act broadly proscribed discrimination in 'inns, public conveyances on land or water, theaters, and other places of public amusement,' without limiting the categories of affected businesses to those impinging upon interstate commerce.  In contrast, the applicability of Title II is carefully limited to enterprises having a direct and substantial relation to the interstate flow of goods and people, except where state action is involved."  *Id*. at 354.

The suggestion is that it is questionable whether an act which has neither an express or facial commerce nexus nor legislative history demonstrating such a nexus may be sustained as an exercise of the commerce power.
     In a similar vein, we note that in *Woods v. Cloyd Miller Co.*, 68 S.Ct. 421 (1946), the Supreme Court, relying on legislative history (see note 43, *supra*), sustained the Housing and Rent Act of 1947, which essentially contained a form of nationwide federal rent control, on the basis of the war power. The legislation did not expressly invoke the war power, but the Court sustained it on that basis, relying on legislative history, despite the Court's recognition that this principle should not extend long after the end of hostilities, as if it did "it may not only swallow up all other powers of Congress but largely obliterate the Ninth and Tenth Amendments as well."  *Id*. at 424. Significantly, the Court never mentioned the Commerce Clause. Moreover, the Court's referenced concern seems to implicitly assume that the Commerce Clause would not reach so far.

We draw support for our conclusion concerning the importance of Congressional findings from recent holdings that when Congress wishes to stretch its commerce power so far as to intrude upon state prerogatives, it must express its intent to do so in a perfectly clear fashion. In *Pennsylvania v. Union Gas*, 109 S.Ct. 2273 (1989) (plurality opinion), the Court held that Congress could use its commerce power to abrogate the sovereign immunity guaranteed to the States by the Eleventh Amendment only if its intent to do so is "unmistakably clear." *Id*. at 2277 (quoting *Atascadero State Hospital v. Scanlon*, 105 S.Ct. 3142, 3147 (1985)). In another case decided the same day, the Court explained that this rule exists because "abrogation of sovereign immunity upsets the fundamental constitutional balance between the Federal Government and the States, placing a considerable strain on the principles of federalism that inform Eleventh Amendment doctrine." *Dellmuth v. Muth*, 109 S.Ct. 2397, 2400 (1989) (citations and internal quotation marks omitted). Two years later, in *Gregory v. Ashcroft*, the Court held that the Age Discrimination in Employment Act (ADEA) did not sweep away the Missouri Constitution's provision for the mandatory retirement of state judges at age seventy. Arguing that a State's power to set the qualifications for its judiciary "is a decision of the most fundamental sort for a sovereign entity," 111 S.Ct. at 2400, the Court held that the ADEA did not bespeak a sufficiently clear intent to annul this state prerogative:

> "Congressional interference with this decision of the people of Missouri, defining their constitutional officers, would upset the usual constitutional balance of federal and state powers. For this reason, 'it is incumbent upon the federal courts to be certain of

Congress' intent before finding that federal law overrides' this balance." *Id*. at 2401 (quoting *Atascadero*, 105 S.Ct. at 3147).[48]

We recognize that the rule being applied in those cases is one of statutory construction. Nevertheless, *Gregory*, *Union Gas*, and *Bass* establish that Congress' *power* to use the Commerce Clause in such a way as to impair a State's sovereign status, and its *intent* to do so, are related inquiries. Thus, in *Gregory*, Congress' power to trump the Missouri Constitution was unquestioned but its intent to do so was unclear; hence the Court held that the State's Tenth Amendment interests would prevail. Here, Congress surely intended to make the possession of a firearm near a school a federal crime, but it has not taken the steps necessary to demonstrate that such

---

[48] The Court then quoted extensively from *Will v. Michigan Dep't of State Police*, 109 S.Ct. 2304 (1989). The *Will* Court had stated:

"[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.' *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985); . . . *Atascadero* was an Eleventh Amendment case, but a similar approach is applied in other contexts. Congress should make its intention 'clear and manifest' if it intends to pre-empt the historic powers of the States, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed.2d 1447 (1947), or if it intends to impose a condition on the grant of federal moneys, *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 16, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981); *South Dakota v. Dole*, 483 U.S. 203, 207, 107 S.Ct. 2793, 2795, 97 L.Ed.2d 171 (1987). 'In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision.' *United States v. Bass*, 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971)." *Id*. at 2308-09.

49

an exercise of power is within the scope of the Commerce Clause.

In 1985, the Supreme Court held that the Tenth Amendment imposes no internal limitation upon the Commerce Clause; as long as Congress acts within the commerce power it cannot violate the Tenth Amendment. *See Garcia v. San Antonio Metro. Trans. Auth.*, 105 S.Ct. 1005 (1985) (overruling *National League of Cities v. Usery*, 96 S.Ct. 2465 (1976)). The *Garcia* Court sought to assuage the fears of four dissenting Justices by arguing that, as a body of state representatives, Congress would respect the sovereignty of the several States and could be trusted to police the constitutional boundary between the Tenth Amendment and the Commerce Clause. *See Garcia*, 105 S.Ct. at 1017-19. By expecting Congress to build a more sturdy foundation for the exercise of its commerce power than it has done in this case, we hope to

> "further[] the spirit of *Garcia* by requiring that decisions restricting state sovereignty be made in a deliberate manner by Congress, through the explicit exercise of its lawmaking power to that end. . . . [T]o give the state-displacing weight of federal law to mere congressional *ambiguity* would evade the very procedure for lawmaking on which *Garcia* relied to protect states' interests." L. Tribe, American Constitutional Law § 6-25, at 480 (2d ed. 1988) (footnote omitted).

The Gun Free School Zones Act extends to criminalize any person's carrying of any unloaded shotgun, in an unlocked pickup truck gun rack, while driving on a county road that at one turn happens to come within 950 feet of the boundary of the grounds of a one-room church kindergarten located on the other side of a river, even during the summer when the kindergarten is not in session. Neither the act itself nor its legislative history reflect any Congressional determination that the possession

50

denounced by section 922(q) is in any way related to interstate commerce or its regulation, or, indeed, that Congress was exercising its powers under the Commerce Clause. Nor do any prior federal enactments or Congressional findings speak to the subject matter of section 922(q) or its relationship to interstate commerce. Indeed, section 922(q) plows thoroughly new ground and represents a sharp break with the long-standing pattern of federal firearms legislation.[49]

The district court sustained section 922(q) on the basis that the "'business' of elementary, middle and high schools . . . affects interstate commerce." However, as noted, there is no finding, legislative history, or evidence to support section 922(q) on this basis. The management of education, of course, has traditionally been a state charge, as Congress has expressly

_____

[49] Thus, we are not faced with a situation such as that addressed by Justice Powell in his concurrence in *Fullilove v. Klutznick*, 100 S.Ct. 2758 (1980). *See id*. at 2787 (Powell, J., concurring) ("After Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in that area.").

*See also City of Richmond v. J.A. Croson Co*., 109 S.Ct. 706 (1989) (plurality opinion), in which the Court held unconstitutional Richmond's plan requiring thirty percent of public subcontracting work to be given to minority-owned business, in part because of the city's failure adequately to supports its "finding" that past discrimination necessitated race-conscious remedial action. Specifically, the Court rejected the city's reliance upon findings made by Congress (and used by the Court to sustain a similar federal racial set-aside in *Fullilove*) that there had been nationwide discrimination against blacks in the construction industry, saying that "[t]he probative value of these findings for demonstrating the existence of discrimination in Richmond is extremely limited." *Id*. at 727. Further, the Court saw "*absolutely no evidence* of past discrimination against Spanish-speaking, Oriental, Indian, Eskimo, or Aleut persons in any aspect of the Richmond construction industry." *Id*. at 728 (original emphasis).

51

recognized. *See* 20 U.S.C. § 3401(4) ("The Congress finds that . . . in our Federal system, the primary public responsibility for education is reserved respectively to the States and the local school systems and other instrumentalities of the States.").[50] We are unwilling to ourselves simply assume that the concededly intrastate conduct of mere possession by any person of any firearm substantially affects interstate commerce, or the regulation thereof, whenever it occurs, or even most of the time that it occurs, within 1000 feet of the grounds of any school, whether or not then in session. If Congress can thus bar firearms possession

---

[50] We reject two related arguments by the government in this connection. First it urges that section 922(q) "is not fundamentally different from the 'schoolyard statute,' 21 U.S.C. § 860, which provides greater punishment for drug offenses occurring within 1000 feet of a school." However, this statement ignores the fundamental difference that all drug trafficking, intrastate as well as interstate, has been held properly subject to federal regulation on the basis of detailed Congressional findings that such was necessary to regulate interstate trafficking. *See United States v. Lopez*, 459 F.2d 949, 951-53 (5th Cir.), *cert. denied sub nom. Llerena v. United States*, 93 S.Ct. 130 (1972). Thus, section 860 is not a regulation of schools but of drugs, and its jurisdictional foundation is the now unchallenged federal authority over intrastate as well as interstate narcotics trafficking. See cases cited in note 10, *supra*.

Second, the government urged the district court that "[t]he federal government has provided thousands and thousands of dollars in federal educational grant moneys to the San Antonio Independent School District . . . . The federal government is entitled to protect its investment in education . . . ." We reject this contention. Although Congress may attach conditions to the receipt of federal funds, it must do so unambiguously. *See South Dakota v. Dole*, 107 S.Ct. 2793, 2796 (1987); *Pennhurst State School & Hospital v. Halderman*, 101 S.Ct. 1531, 1540 (1981). We cannot view section 922(q) as a condition meant to "protect the federal investment in schools," as the government puts it, because Congress has in no way tied section 922(q) to federal funding. Section 922(q), which expressly extends to "private" and "parochial" as well as "public" schools, does not even mention federal funding, and applies whether or not such funding is received.

52

because of such a nexus to the grounds of *any* public or private school, and can do so without supportive findings or legislative history, on the theory that education affects commerce, then it could also similarly ban lead pencils, "sneakers," Game Boys, or slide rules.

The government seeks to rely on the rule that "[w]here the *class of activities* is regulated and that *class* is within the reach of the federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." *Perez*, 91 S.Ct. at 1361 (quoting *Maryland v. Wirtz*, 88 S.Ct. 2017, 2022 (1968)). This theory has generally been applied to the regulation of a class of activities the individual instances of which have an interactive effect, usually because of market or competitive forces, on each other and on interstate commerce. A given local transaction in credit, or use of wheat, because of national market forces, has an effect on the cost of credit or price of wheat nationwide. Some such limiting principle must apply to the "class of activities" rule, else the reach of the Commerce Clause would be unlimited, for virtually all legislation is "class based" in some sense of the term. We see no basis for assuming, particularly in the absence of supporting Congressional findings or legislative history, that, for example, ordinary citizen possession of a shotgun during July 900 feet from the grounds of an out-of-session private first grade in rural Llano County, Texas, has any effect on education even in relatively nearby Austin, much less in Houston or New Orleans. Nor can we assume that elementary education in Houston substantially affects elementary education in Atlanta. As noted, any such

holding would open virtually all aspects of education, public and private, elementary and other, to the reach of the Commerce Clause.[51]

We hold that section 922(q), in the full reach of its terms, is invalid as beyond the power of Congress under the Commerce Clause.[52]  Whether with adequate Congressional findings or legislative history, national legislation of similar scope could be sustained, we leave for another day.  Here we merely hold that Congress has not done what is necessary to locate section 922(q) within the Commerce Clause.  And, we expressly do not resolve the question whether section 922(q) can ever be constitutionally applied.  Conceivably, a conviction under section 922(q) might be sustained if the government alleged and proved that the offense had a nexus to commerce.[53]  Here, in fact, the parties stipulated that

---

[51]    The government also urges that we have sustained the prohibition of all simple narcotics possession. *See United States v. Lopez*, 461 F.2d 499 (5th Cir. 1972) (*per curiam*). However, there we relied on our decision in the earlier, different *Lopez* case, 459 F.2d 949, where we in turn relied on Congressional findings that such was necessary to effectively regulate the interstate trafficking in narcotics.  The possession proscription was a necessary means to regulate the interstate commercial trafficking in narcotics.  There is nothing analogous in the present case.  Section 922(q) is not related (either in terms or by legislative findings or history) to the regulation of interstate trafficking in firearms or to any scheme for such purpose, and there has been no general outlawing of the possession of ordinary firearms by ordinary citizens.  Moreover, firearms do not have the fungible and untraceable characteristics of narcotics.

[52]    No other basis for section 922(q) has been suggested.

[53]    *Cf. Heart of Atlanta*, 85 S.Ct. at 360 ("We, therefore, conclude that the action of the Congress in the adoption of the Act *as applied here to a motel which concededly serves interstate travelers* is within the power granted it by the Commerce Clause of the Constitution.") (emphasis added).  However, the "as

54

a BATF agent was prepared to testify that Lopez's gun had been manufactured outside of the State of Texas. Lopez's conviction must still be reversed, however, because his indictment did not allege *any* connection to interstate commerce. An indictment that fails to allege a commerce nexus, where such a nexus is a necessary element of the offense, is defective. *See Stirone v. United States*, 80 S.Ct. 270, 273 (1960) (Hobbs Act); *United States v. Hooker*, 841 F.2d 1225, 1227-32 (4th Cir. 1988) (en banc) (RICO); *United States v. Moore*, 185 F.2d 92, 94 (5th Cir. 1950) (FLSA). This is true even though the language of section 922(q) contains no such requirement. *See Russell v. United States*, 82 S.Ct. 1038, 1047-48 (1962); 2 W. LaFave & J. Israel, *Criminal Procedure* § 19.2, at 452 (1984). Finally, because an indictment, unlike a bill of information, cannot be amended, the failure to allege each element is fatal. *Cf. United States v. Garrett*, 984 F.2d 1402, 1415 (5th Cir. 1993); *United States v. Mize*, 756 F.2d 353, 355-56 (5th Cir. 1985).

For the reasons stated, the judgment of conviction is reversed and the cause is remanded with directions to dismiss the indictment.[54]

REVERSED

---

applied" issue has not been briefed or argued with respect to section 922(q) and, as noted, we expressly do not resolve it.

[54] Because we reverse Lopez's conviction, we do not reach the challenge he raises to his sentence.

55