UNITED STATES of America, Plaintiff,

v.

**Cody D. GLOVER, Defendant.**

No. 93–10088–01.

United States District Court,
D. Kansas.

Jan. 12, 1994.

Randall Rathbun, U.S. Atty. and Robin Fowler, Asst. U.S. Atty., Wichita, KS, for plaintiff.

T. Lynn Ward, Wichita, KS, for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, Chief Judge.

This matter comes before the court on defendant Cody D. Glover's motion to dismiss the indictment. The government indicted Glover on violations of subsections (1)(A) and (2) of 18 U.S.C. § 922(q), claiming the defendant possessed a firearm within a school zone.[1] Glover maintains the indictment should be dismissed because § 922(q),[2] which is known as the Gun–Free School Zones Act, is unconstitutional. He claims

1. The government alleges the following facts: The Wichita police observed Glover and Shane B. Trigg on the premises of Robinson Junior High School near the intersections of Second and Bleckley streets. Glover was flashing gang signs to junior high students, including his younger brother. Upon conducting a pat-down search of Glover, the police discovered a .38 semi-automatic pistol. The defendant was arrested and subsequently admitted to being a member of the Fountain Street Crips gang, to flashing the Crips sign, and to buying the pistol on the street. Glover does not admit to the veracity of the government's allegations. (Def.'s Memo. at 2; Pltf.'s Response at 1.)

2. The language of the statute provides:

(1)(A) It shall be unlawful for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone.

(B) Subparagraph (A) shall not apply to the possession of a firearm—

(i) on private property not part of school grounds;

(ii) if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtain such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

(iii) which is—

(I) not loaded; and

(II) in a locked container, or a locked firearms rack which is on a motor vehicle;

(iv) by an individual for use in a program approved by a school in the school zone;

(v) by an individual in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual;

the statute "is an unconstitutional extension of federal control over public schools and is an unconstitutional exercise of the power of Congress to regulate activities affecting interstate commerce." (Def.'s Memo. at 1–2.) The government contends the Commerce Clause permitted the congressional act in question.

Glover argues § 922(q) is an unconstitutional extension of federal control over public schools because the Constitution does not provide for the federal regulation or control of schools and education and because the Tenth Amendment states "powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are

(vi) by a law enforcement officer acting in his or her official capacity; or

(vii) that is unloaded and is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities.

(2)(A) Except as provided in subparagraph (B), it shall be unlawful for any person, knowingly or with reckless disregard for the safety of another, to discharge or attempt to discharge a firearm at a place that the person knows is a school zone.

(B) Subparagraph (A) shall not apply to the discharge of a firearm—

(i) on private property not part of school grounds;

(ii) as part of a program approved by a school in the school zone, by an individual who is participating in the program;

(iii) by an individual in accordance with a contract entered into between a school in a school zone and the individual or an employer of the individual; or

(iv) by a law enforcement officer acting in his or her official capacity.

(3) Nothing in this subsection shall be construed as preempting or preventing a State or local government from enacting a statute establishing gun-free school zones as provided in this subsection.

18 U.S.C. § 922(q).

The term "school zone" means—

(A) in, or on the grounds of a public, parochial or private school; or

(B) within a distance of 1,000 feet from the grounds of a public, parochial or private school.

18 U.S.C. § 921(25).

The term "school" means a school which provides elementary or secondary education, as determined under State law.

18 U.S.C. § 921(26).

[23, 2413, 5114]

reserved to the States." *See* U.S. Const. amend. X. The defendant relies upon the long-recognized precept of constitutional law that there are restrictions upon Congress' authority to enact legislation. *See Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 325–26, 4 L.Ed. 97 (1816) ("The government ... of the United States, can claim no powers which are not granted to it by the constitution, and the powers actually granted, must be such as are expressly given, or given by necessary implication."); *see also United States v. Fox,* 95 U.S. 670, 672, 24 L.Ed. 538 (1878) ("[A]n act committed within a State, ... cannot be made an offense against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States. An act not having any such relation is one in respect to which the State can alone legislate."). Glover points out that regulation of education and control of schools traditionally has been left to the states, *see Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968); *Petrey v. Flaugher,* 505 F.Supp. 1087, 1090 (E.D.Ky. 1981),[3] and that Kansas is no exception. *See* Kan. Const. art. VI, § 1 (1859, amended 1966) ("The legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities which may be organized and changed in such manner as may be provided

by law."); *see also* Kan. Const. art. VI, § 2 (1859, amended 1966) (state board of education "shall have general supervision of public schools, educational institutions and all the education interests of the state"); Kan. Const. art. VI, § 5 (1859, amended 1966) ("Local public schools under the general supervision of the state board of education shall be maintained, developed and operated by locally elected boards.").

The defendant argues 18 U.S.C. § 922(q) impinges upon state and local law because state and local authorities have made provisions prohibiting scenarios similar to the allegations in this case. For example, Kansas law prohibits possession of a gun on school property or grounds, the violation of which is a class B misdemeanor. *See* K.S.A. 21–4204 (1992 Supp.). Additionally, the City of Wichita, Kansas has enacted an ordinance prohibiting the carrying of a concealed weapon. Violation of this ordinance is a misdemeanor, subjecting the violator to forfeiture of the weapon and a possible fine and jail term. *See* Wichita, Kan. Ordinances tit. 5, ch. 5.88, §§ 5.88.010(b), 5.88.090 (1987). Pursuant to the policy of the Wichita School Board, a student found in possession of a dangerous weapon on school property may be expelled. *See* Wichita, Kan., U.S.D. 259 Board Policy PL466 (Jan. 1993).[4]

Citing *United States v. Bass,* 404 U.S. 336, 349, 92 S.Ct. 515, 523, 30 L.Ed.2d 488 (1971),[5]

3. The cases upon which the defendant relies discussed regulation and control of education being left to the states in the context of addressing if and when federal courts should intercede. *See Epperson,* 393 U.S. at 104, 89 S.Ct. at 270 ("By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."); *Petrey,* 505 F.Supp. at 1090 ("[P]rerogative of managing the public schools belongs to the states and the boards of education and administrators to whom the state has delegated it. The federal courts have the power to supersede their decisions only where their actions are clearly unconstitutional.").

4. Presumably, the decision to prosecute Glover under § 922(q) was based upon the more severe federal penalty. See 18 U.S.C. § 924(a)(4) ("Whoever violates section 922(q) shall be fined not more than $5,000, imprisoned for not more

than 5 years, or both.... [T]he term of imprisonment imposed ... shall not run concurrently with any other term of imprisonment imposed under any other provision of law.").

5. In *Bass,* the United States Supreme Court discussed the federal-state balance in the context of construing an ambiguous federal criminal statute. The Court stated:

[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance. Congress has traditionally been reluctant to define as a federal crime conduct readily denounced as criminal by the States. This congressional policy is rooted in the same concepts of American federalism that have provided the basis for judge-made doctrines.... [W]e will not be quick to assume that Congress has meant to effect a significant change in the sensitive relation between federal and state criminal jurisdiction.

and *United States v. Darby*, 312 U.S. 100, 120–21, 61 S.Ct. 451, 460–61, 85 L.Ed. 609 (1941), Glover suggests a two-part analysis: (1) did Congress intend to supersede the states' authority, and (2), if so, did Congress have the authority under the Constitution to enact the legislation? *See United States v. Lopez*, 2 F.3d 1342, 1365 (5th Cir.1993) ("Congress' *power* to use the Commerce Clause ... to impair a State's sovereign status, and its *intent* to do so, are related inquiries."). The defendant then argues the express language of § 922(q) evidences Congress' intent to *not* supersede the states' authority. *See* 18 U.S.C. § 922(q)(3) ("Nothing in this subsection shall be construed as preempting or preventing a State or local government from enacting a statute establishing gun-free school zones as provided in this subsection."). The defendant apparently is arguing this court need not reach the question of whether Congress had the power to enact the statute. Glover, however, also contends Congress lacked the authority to enact § 922(q). This contention will be addressed subsequently.

The government acknowledges the lack of an express constitutional provision authorizing Congress to regulate or control schools and education, but points out the lack of an express provision has not prevented federal legislation in a myriad of areas, such as the trafficking of drugs within a school zone. *See* 21 U.S.C. § 860; *see, e.g., United States v. McDougherty*, 920 F.2d 569, 572 (9th Cir. 1990), *cert. denied*, 499 U.S. 911, 111 S.Ct. 1119, 113 L.Ed.2d 227 (1991) ("Congress has already determined, and the courts have accepted as rational, that drug trafficking affects interstate commerce. It would be highly illogical to believe that such trafficking somehow ceases to affect commerce when carried out within 1000 feet of a school." (Citation omitted.)).[6] The government also notes various federal constitutional and statutory provisions have been applied to the regulation and control of schools and education. *See, e.g., Zobrest v. Catalina Foothills Sch. Dist.*, —— U.S. ——, ——, 113 S.Ct. 2462, 2464, 125 L.Ed.2d 1, 7 (1993) (the Establishment Clause does not prevent a public school district from providing, pursuant to the Individuals with Disabilities Act, a sign language interpreter to a deaf student attending parochial school). Additionally, the government rebuts Glover's Tenth Amendment concerns, arguing the Tenth Amendment, by definition, cannot prohibit constitutionally authorized congressional action. *See New York v. United States*, —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

The *New York* decision discussed the "delicate balance" between state and federal authority, and although the case involved a challenge to three provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985, the state-federal discussion is pertinent to the case at hand. Writing for the majority, Justice O'Connor stated:

In some cases the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I of the Constitution. See, e.g., *Perez v. United States*, 402 US 146, 28 L Ed 2d 686, 91 S Ct 1357 (1971); *McCulloch v. Maryland* [17 U.S.], 4 Wheat 316, 4 L Ed 579 (1819). In other cases the Court has sought to determine whether an Act of Congress invades the province of state sovereignty reserved by the Tenth Amendment. See, e.g., *Garcia v. San Antonio Metropolitan Transit Authority*, 469 US 528, 83 L Ed 2d 1016, 105 S Ct 1005 (1985); *Lane County v. Oregon* [74 U.S.], 7 Wall 71, 19 L Ed 101 (1869).... If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States; ...

It is in this sense that the Tenth Amendment "states but a truism that all is retained which has not been surrendered."

---

404 U.S. at 349, 92 S.Ct. at 523 (citation omitted).

**6.** An argument can be made that the Gun–Free School Zones Act does not regulate schools or education in any way. *Cf. McDougherty*, 920 F.2d at 572 n. 2 (In rejecting a similar argument concerning the constitutionality of 21 U.S.C. § 845a (transferred to 21 U.S.C. § 860), the Ninth Circuit noted "[t]he schoolyard statute does not in any way regulate the schools themselves; it merely increases the punishment for those who sell drugs near the school.").

*United States v. Darby*, 312 US 100, 124, 85 L Ed 609, 61 S Ct 451 [462], 132 ALR 1430 (1941)....

Congress exercises its conferred powers subject to the limitations contained in the Constitution.... The Tenth Amendment likewise restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, as we have discussed, is essentially a tautology. Instead, the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States. The Tenth Amendment thus directs us to determine ... whether an incident of state sovereignty is protected by a limitation on an Article I power.

. . . .

This framework has been sufficiently flexible over the past two centuries to allow for enormous changes in the nature of government. The Federal Government undertakes activities today that would have been unimaginable to the Framers in two senses; first, because the Framers would not have conceived that *any* government would conduct such activities; and second, because the Framers would not have believed that the *Federal* Government, rather than the States, would assume such responsibilities. Yet the powers conferred upon the Federal Government by the Constitution were phrased in language broad enough to allow for the expansion of the Federal Government's role.

. . . .

... We have observed that the Supremacy Clause gives the Federal Government "a decided advantage in th[e] delicate balance" the Constitution strikes between State and Federal power. *Gregory v. Ashcroft*, 501 US [452], at ——, [111 S.Ct. 2395, 2400, 115 L Ed 2d 410, 423 (1991)].

The actual scope of the Federal Government's authority with respect to the States has changed over the years, therefore, but the constitutional structure underlying and limiting that authority has not. In the end, just as a cup may be half empty or half full, it makes no difference whether one views the question at issue in this case as one of ascertaining the limits of the power delegated to the Federal Government under the affirmative provisions of the Constitution or one of discerning the core of sovereignty retained by the States under the Tenth Amendment.

—— U.S. at —— – ——, 112 S.Ct. at 2417–19, 120 L.Ed.2d at 137–39 (citations omitted).

Glover's two grounds for challenging the constitutionality of 18 U.S.C. § 922(q) are but "mirror images of each other." *Id.* at ——, 112 S.Ct. at 2417, 120 L.Ed.2d at 137. Thus, the defendant's dual challenge to § 922(q) may be addressed by focusing upon whether the Commerce Clause empowered Congress to enact the statute because, if so, there are no Tenth Amendment concerns.[7]

7. The government refutes the defendant's claim that § 922(q) " 'supersedes' state or local law." (Govt.'s Response at 8.) This court's attention is directed to *United States v. Minnick*, 949 F.2d 8, 10 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1698, 118 L.Ed.2d 408 (1992), in which the First Circuit Court of Appeals held that federal gun control legislation does not violate the Tenth Amendment because such legislation "is not directed at states as such, but at individual behavior." *See United States v. Jarrett*, 705 F.2d 198, 203 (7th Cir.1983), *cert. denied*, 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984) ("Rather than regulate the internal functions of the states, the Hobbs Act regulates the activities of individuals.").

The government also contends § 922(q) does not supersede, but is concurrent with, state or local law because the federal statute does not prohibit state or local action. Thus, according to the government, state and local authorities have the option to prosecute or punish the defendant under their respective laws. *See* 18 U.S.C. § 922(q)(3) ("Nothing in this subsection shall be construed as preempting or preventing a State or local government from enacting a statute establishing gun-free school zones as provided in this subsection."); *see also Abbate v. United States*, 359 U.S. 187, 194, 79 S.Ct. 666, 670, 3 L.Ed.2d 729 (1959) ("[A]n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each."); *United States v. Gourley*, 835 F.2d 249, 250 (10th Cir.1987), *cert. denied*, 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988) (same).

Glover correctly assumes the government will argue the Commerce Clause[8] permitted Congress to enact the Gun–Free School Zones Act. Congress generally relies upon the Commerce Clause to enact federal criminal laws. *See O'Rourke v. City of Norman,* 875 F.2d 1465, 1469 (10th Cir.), *cert. denied,* 493 U.S. 918, 110 S.Ct. 280, 107 L.Ed.2d 260 (1989); 1 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 4.10(c) (1992). Under the Commerce Clause, Congress can regulate not only "the use of channels of interstate or foreign commerce" and the "protection of the instrumentalities of interstate commerce ... or persons or things in commerce," but also "activities affecting commerce." *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971). Here, the government argues guns in school zones affect commerce.

In support of his argument that Congress exceeded its authority to regulate interstate commerce in the passage of § 922(q), Glover primarily relies upon *United States v. Lopez,* 2 F.3d 1342 (5th Cir.1993).[9] In *Lopez,* the defendant successfully challenged the constitutionality of 18 U.S.C. § 922(q). The Fifth Circuit Court of Appeals opinion is a most comprehensive analysis of the Gun–Free School Zones Act and of federal firearm legislation in general. As the *Lopez* court noted, Congress did not address the basis for its authority to enact § 922(q)—there was no testimony before Congress nor any congressional findings that gun violence in schools affects interstate commerce. In fact, this was pointed out at a House subcommittee hearing on the proposed legislation.[10]

The Fifth Circuit makes some import of Congress' silence pertaining to findings under the Commerce Clause.[11]

We are unwilling to ourselves simply assume that the concededly intrastate conduct of mere possession by any person of any firearm substantially affects interstate commerce, or the regulation thereof, whenever it occurs, or even most of the time

---

**8.** The Constitution empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

**9.** Glover also argues possession of guns in school zones is not an activity affecting commerce. He contends "the purpose of schools is education, not business or commerce." (Def.'s Memo. at 8.) The defendant points out that neither the statutory language nor the legislative history of § 922(q) demonstrates a nexus between schools/education and commerce. He notes this lack of a nexus is in contrast to other provisions of § 922. *See* 18 U.S.C. § 922(a), (g).

**10.** Richard Cook, Chief of the Firearms Division of the Bureau of Alcohol, Tobacco and Firearms, testified:

[W]e would note that the source of constitutional authority to enact the legislation is not manifest on the face of the bill. By contrast, when Congress first enacted the prohibitions against possession of firearms by felons, mental incompetents and others, the legislation contained specific findings relating to the Commerce Clause and other constitutional bases, and the unlawful acts specifically included a commerce element.

*Gun–Free School Zones Act of 1990: Hearing on H.R. 3757 Before the Subcomm. on Crime of the House Comm. on the Judiciary,* 101st Cong., 2d Sess. at 10 (1990) (statement of Richard Cook).

When signing the Crime Control Act of 1990, of which the Gun–Free School Zones Act was a part, President George Bush expressed concern about legislation that allowed the federal government to encroach upon traditional state authority. President Bush said:

I am also disturbed by provisions in S. 3266 [H.R. 3757] that unnecessarily constrain the discretion of State and local governments. Examples are found in Title VIII's "rural drug enforcement" program; in Title XV's "drug-free school zones" program, and in Title XVII's program for "correctional options incentives." Most egregiously, section 1702 inappropriately overrides legitimate State firearms laws with a new and unnecessary Federal law. The policies reflected in these provisions could legitimately be adopted by the States, but they should not be imposed on the States by the Congress.

Statement by President George Bush upon Signing S. 3266, 26 Weekly Comp.Pres.Doc. 1944 (Dec. 3, 1990), *reprinted in* 1990 U.S.C.C.A.N. 6696–1.

**11.** According to the Fifth Circuit's interpretation,

[b]oth the management of education, and the general control of simple firearms possession by ordinary citizens, have traditionally been a state responsibility and section 922(q) indisputably represents a singular incursion by the Federal Government into territory long occupied by the States. *In such a situation where we are faced with competing constitutional concerns, the importance of Congressional findings is surely enhanced.*

*Lopez,* 2 F.3d at 1364 (emphasis added).

that it occurs, within 1000 feet of the grounds of any school, whether or not then in session. If Congress can thus bar firearms possession because of such a nexus to the grounds of *any* public or private school, and can do so without supportive findings or legislative history, on the theory that education affects commerce, then it could also similarly ban lead pencils, "sneakers," Game Boys, or slide rules.

*Lopez,* 2 F.3d at 1366–67. Apparently, if Congress has done this, i.e., found some connection between the use of guns at the school place and interstate commerce, then the Fifth Circuit would have been unwilling to challenge the rational basis for such congressional findings.[12] *See Federal Energy Regulatory Comm'n v. Mississippi,* 456 U.S. 742, 754, 102 S.Ct. 2126, 2134, 72 L.Ed.2d 532 (1982) ("A court may invalidate legislation enacted under the Commerce Clause only if it is clear that there is no rational basis for a congressional finding that the regulated activity affects interstate commerce, or that there is no reasonable connection between the regulatory means selected and the asserted ends."); *see also id.* (a congressional act is presumed constitutional); *United States v. Agnew,* 931 F.2d 1397, 1404 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 237, 116 L.Ed.2d 193 (1991) (same).

In the fall of 1993, perhaps in response to the *Lopez* decision, an amendment to the Gun–Free School Zones Act explicitly setting forth such findings was introduced in both the House of Representatives and the Senate.[13] As Justice O'Connor noted in *New*

---

**12.** The Fifth Circuit stated that "[p]ractically speaking, such findings almost always end the matter." *Lopez,* 2 F.3d at 1363. The court was not aware of any "Supreme Court decision in the last half century that has set aside such a finding as without rational basis." *Id.,* n. 43. The Fifth Circuit subsequently concluded:

Whether with adequate Congressional findings or legislative history, national legislation of similar scope could be sustained, we leave for another day. Here we merely hold that Congress has not done what is necessary to locate section 922(q) within the Commerce Clause, And, we expressly do not resolve the question whether section 922(q) can ever be constitutionally applied. Conceivably, a conviction under section 922(q) might be sustained if the government alleged and proved that the offense had a nexus to commerce.

*Lopez,* 2 F.3d at 1368.

**13.** The proposed amendment reads as follows:

SEC. 2972. GUN–FREE SCHOOL ZONES.

(a) AMENDMENT OF TITLE 18, UNITED STATES CODE.—SECTION 922(Q) OF TITLE 18, UNITED STATES CODE, IS AMENDED—

(1) BY REDESIGNATING PARAGRAPHS (1), (2), AND (3) AS PARAGRAPHS (2), (3), AND (4), RESPECTIVELY; AND

(2) BY INSERTING AFTER "(Q)" THE FOLLOWING NEW PARAGRAPH:

"(1) THE CONGRESS FINDS AND DECLARES THAT—

"(A) CRIME, PARTICULARLY CRIME INVOLVING DRUGS AND GUNS, IS A PERVASIVE, NATIONWIDE PROBLEM;

"(B) CRIME AT THE LOCAL LEVEL IS EXACERBATED BY THE INTERSTATE MOVEMENT OF DRUGS, GUNS, AND CRIMINAL GANGS;

"(C) FIREARMS AND AMMUNITION MOVE EASILY IN INTERSTATE COMMERCE AND HAVE BEEN FOUND IN IN-CREASING NUMBERS IN AND AROUND SCHOOLS, AS DOCUMENTED IN NUMEROUS HEARINGS IN BOTH THE JUDICIARY COMMITTEE OF THE HOUSE OF REPRESENTATIVES AND THE JUDICIARY COMMITTEE OF THE SENATE;

"(D) IN FACT, EVEN BEFORE THE SALE OF A FIREARM, THE GUN, ITS COMPONENT PARTS, AMMUNITION, AND THE RAW MATERIALS FROM WHICH THEY ARE MADE HAVE CONSIDERABLY MOVED IN INTERSTATE COMMERCE;

"(E) WHILE CRIMINALS FREELY MOVE FROM STATE TO STATE, ORDINARY CITIZENS AND FOREIGN VISITORS MAY FEAR TO TRAVEL TO OR THROUGH CERTAIN PARTS OF THE COUNTRY DUE TO CONCERN ABOUT VIOLENT CRIME AND GUN VIOLENCE, AND PARENTS MAY DECLINE TO SEND THEIR CHILDREN TO SCHOOL FOR THE SAME REASON;

"(F) THE OCCURRENCE OF VIOLENT CRIME IN SCHOOL ZONES HAS RESULTED IN A DECLINE IN THE QUALITY OF EDUCATION IN OUR COUNTRY;

"(G) THIS DECLINE IN THE QUALITY OF EDUCATION HAS AN ADVERSE IMPACT ON INTERSTATE COMMERCE AND THE FOREIGN COMMERCE OF THE UNITED STATES;

"(H) STATES, LOCALITIES, AND SCHOOL SYSTEMS FIND IT ALMOST IMPOSSIBLE TO HANDLE GUN–RELATED CRIME BY THEMSELVES; EVEN STATES, LOCALITIES, AND SCHOOL SYSTEMS THAT HAVE MADE STRONG EFFORTS TO PREVENT, DETECT, AND PUNISH GUN–RELATED CRIME FIND THEIR EFFORTS UNAVAILING DUE IN PART TO THE FAILURE OR INABILITY OF OTHER STATES OR LOCALITIES TO TAKE STRONG MEASURES; AND

"(I) CONGRESS HAS POWER, UNDER THE INTERSTATE COMMERCE CLAUSE

*York,* — U.S. at ——, 112 S.Ct. at 2418–19, 120 L.Ed.2d at 138,

> [t]he volume of interstate commerce and the range of commonly accepted objects of government regulation have … expanded considerably in the last 200 years, and the regulatory authority of Congress has expanded along with them. As interstate commerce has become ubiquitous, activities once considered purely local have come to have effects on the national economy, and have accordingly come within the scope of Congress' commerce power.[14]

Subsequent to the filing of the memoranda in this case, the Ninth Circuit Court of Appeals handed down its decision upholding the constitutionality of 18 U.S.C. § 922(q) in *United States v. Edwards,* 13 F.3d 291 (9th Cir.1993).[15] That circuit held with its view in *United States v. Evans,* 928 F.2d 858 (9th Cir.1991). The *Edwards* court stated that in *Evans* it had held "the violence created through the possession of firearms adversely affects the national economy, and consequently, it was reasonable for Congress to regulate the possession of firearms pursuant to the Commerce Clause." *Edwards,* 13 F.3d at 292 (citing *Evans,* 928 F.2d at 862). Citing *United States v. McDougherty,* 920 F.2d 569, 572 (9th Cir.1990), the *Edwards* court concluded "[t]he addition of the condition … that the firearms be possessed within 1000 feet of a school does not in any way diminish Congress' power to regulate firearms under the Commerce Clause." *Edwards,* 13 F.3d at 293.

Following *Perez v. United States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), and *Evans,* 928 F.2d at 862, the Ninth Circuit in *Edwards* iterated its holding "that it is un-

necessary for Congress to make express findings that a particular activity or class of activities affects interstate commerce in order to exercise its legislative authority pursuant to the Commerce Clause." 13 F.3d at 293; *see Perez,* 402 U.S. at 154, 91 S.Ct. at 1361 (quoting *Maryland v. Wirtz,* 392 U.S. 183, 193, 88 S.Ct. 2017, 2022, 20 L.Ed.2d 1020 (1968)) ("Where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class."). Support also was drawn from the observation of Justice Powell in *Fullilove v. Klutznick,* 448 U.S. 448, 503, 100 S.Ct. 2758, 2787, 65 L.Ed.2d 902 (1980) (Powell, J., concurring), that "[a]fter Congress has legislated repeatedly in an area of national concern, its Members gain experience that may reduce the need for fresh hearings or prolonged debate when Congress again considers action in that area." The Ninth Circuit simply inferred congressional authority to act federally in this area, finding no reason for Congress to further support its conclusions in the enactment of § 922(q).

The Fifth and Ninth Circuits sharply disagree on the interpretation of the following language found in the *Perez* decision: "We have mentioned in detail the economic, financial, and social setting of the problem as revealed to Congress. We do so not to infer that Congress need make particularized findings in order to legislate." 402 U.S. at 156, 91 S.Ct. at 1362. In a footnote, the Fifth Circuit commented:

> No citation of authority is given, nor is the meaning of the second sentence entirely clear. However, the opinion as a whole shows extensive consideration of and reli-

AND OTHER PROVISIONS OF THE CONSTITUTION, TO ENACT MEASURES TO ENSURE THE INTEGRITY AND SAFETY OF THE NATION'S SCHOOLS BY ENACTMENT OF THIS SUBSECTION."
S. 1607, 103d Cong., 1st Sess. (1993); H.R. 3355, 103d Cong., 1st Sess. (1993).

14.   " 'Even activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations.' " *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* · 452 U.S. 264, 277, 101 S.Ct. 2352, 2360, 69

L.Ed.2d 1 (1981) (quoting *Fry v. United States,* 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975)); *see, e.g., United States v. King,* 485 F.2d 353, 356 (10th Cir.1973) (Commerce Clause permits Congress to regulate intrastate drug activity).

15.   The Westlaw version of the *Edwards* opinion specifies the opinion is subject to revision or withdrawal until the opinion is released for publication in the permanent law reports. As of the date of issuing this memorandum and order, the *Edwards* opinion had not been released for publication in the permanent law reports.

ance on not only the evidence before Congress and the legislative history, but also the formal Congressional findings, which the Court had already observed were "quite adequate" to sustain the act.

*Lopez*, 2 F.3d at 1362 n. 41. The Ninth Circuit respectfully responded that "the Fifth Circuit ha[d] misinterpreted, or refused to follow the decisions of the United States Supreme Court that are binding on all courts inferior to our nation's highest court." *Ed-*

*wards*, 13 F.3d at 293. According to the Ninth Circuit, the sentence the Fifth Circuit found unclear was crystalline if read in the context of the entire paragraph.[16]

Three district courts also have ruled on the constitutionality of the Gun–Free School Zone Act. Two courts found the reasoning of the Fifth Circuit persuasive. *See United States v. Morrow,* 834 F.Supp. 364 (N.D.Ala. 1993); [17] *United States v. Trigg,* 842 F.Supp. 450 (D.Kan.1994).[18] Prior to the Ninth Cir-

---

**16.** The paragraph in question reads:

We have mentioned in detail the economic, financial, and social setting of the problem as revealed to Congress. We do so not to infer that Congress need make particularized findings in order to legislate. We relate the history of the Act in detail to answer the impassioned plea of the petitioner that all that is involved in loan sharking is a traditionally local activity. In appears, instead, that loan sharking in its national setting is one way organized interstate crime holds its guns to the heads of the poor and the rich alike and syphons funds from numerous localities to finance its national operations.

*Perez,* 402 U.S. at 156–57, 91 S.Ct. at 1362–63.

**17.** The *Morrow* court reasoned:

In *Lopez,* the Fifth Circuit was not very kind to Congress. Like the Fifth Circuit, this court suspects that Congress expects courts invariably to presume that Congress intends to hang any and all new federal legislation which purports to control activity within the several states on the so-called Commerce Clause, without Congress having to say so. After all, has not everyone been conditioned to believe that there is nothing which moves or has ever moved which does not support an invocation of the Commerce Clause as the means for conferring federal jurisdiction and control over the activity and/or problem that Congress wishes to govern and/or solve.... But this court joins the Fifth Circuit in expecting Congress at least to share with the public, and with the overworked federal courts upon which Congress thrusts the enforcement of an accelerating volume of federal crime fighting statutes, some articulated, rational, constitutional basis for the federal government's assumption of jurisdiction over the perceived problem, particularly over an area historically governed by states or municipalities under local laws. Although the Congress has systematically whittled away at the old idea of the superiority inherent in the local solution of problems, the principle of federalism still has enough vitality to demand an explanation from Congress when Congress finds that the states' various means of handling a particular societal problem are so ineffectual as to be moribund and in

need of replacement by an overarching new federal remedy.

834 F.Supp. at 365. The Alabama court concluded at 366:

Congress may be able to invent a convincing relationship between the proscription in § 922(q) and its right to regulate interstate commerce, but this court should not be called upon to dream it up for Congress. A generalized salutary purpose is simply not enough to justify the creation of a new federal crime. Liking the way "Gun–Free School Zones" rolls off the tongue does not make § 922(q) constitutional.

**18.** Trigg, Glover's alleged cohort, was indicted of violating § 922(q) and also challenged the constitutionality of that statute. In finding the statute unconstitutional, Judge Belot reasoned:

With due respect to the Ninth Circuit, the court finds the views articulated by the Fifth Circuit to be more faithful to the values of federalism embodied in our Constitution. The court cannot agree with the Ninth Circuit's statement that the Fifth Circuit's holding in *Lopez* is squarely contrary to the Supreme Court's holdings in *Perez* and *Katzenbach [v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964)]. As the Fifth Circuit noted in footnote 41 of its opinion, the statute at issue in *Perez* reflects extensive consideration of and reliance on the evidence before Congress, the legislative history, as well as the formal Congressional findings. In stark contrast, the congressional reports and legislative history make no reference to the impact upon commerce of firearms in schools. Indeed, the absence of any link between the Act and commerce was expressly noted in testimony before Congress.

The court is acutely aware of the problems associated with criminal activity and especially those associated with the increasing use of firearms as an integral aspect of criminal activity. There is no place for weapons—particularly firearms—in and around schools. Nevertheless, Congress must legislate in the area of firearms within the constraints imposed by the Commerce Clause.

*Id.* at 452–53. Judge Belot also found the proposed amendment to § 922(q) lent "credence to the Fifth Circuit's analysis and findings regard-

cuit's decision in *Edwards,* one court upheld the constitutionality of § 922(q). *See United States v. Holland,* 1993 WL 415825 (E.D.Pa. 1993).[19]

These decisions boil down to a philosophical difference. I suppose the distinctions of philosophy are best found in the reasoning of my colleague, Judge Wiseman, in *United States v. Cortner,* 834 F.Supp. 242 (M.D.Tenn.1993), a case in which the Anti Car Theft Act was held unconstitutional because the act lacked any rational nexus to interstate commerce. Judge Wiseman reasoned that notwithstanding congressional intent, courts should be unwilling to construe the Commerce Clause so broadly. He reminded us of the widely and historically held premise of government structure that law enforcement is primarily the business of state and local government, and that we, as a nation, deplore the idea of a national police force.

I find the reasoning of the Ninth Circuit persuasive, although I do not join in that circuit's rebuke of the Fifth Circuit. The *Perez* decision is open to more than one interpretation. It appears, however, the Tenth Circuit Court of Appeals would agree with the Ninth Circuit's interpretation of *Perez.*[20] The Tenth Circuit has stated:

> the absence of formal findings concerning the effect on interstate commerce ... does not prevent Congress from regulating under the Commerce Clause. Only a rational basis need support a finding that a regulat-

ed activity affects interstate commerce and the means selected by Congress need only be reasonably adapted toward the permissible end.

*Morgan v. Secretary of Housing and Urban Dev.,* 985 F.2d 1451, 1455 (10th Cir.1993) (citations omitted). In *United States v. Lane,* 883 F.2d 1484, 1492 (10th Cir.1989), *cert. denied,* 493 U.S. 1059, 110 S.Ct. 872, 107 L.Ed.2d 956 (1990), the Tenth Circuit rejected the defendants' argument that Congress did not validly invoke its power under the Commerce Clause because "'there is absolutely no legislative history which reflects that Congress made any findings about racially motivated interference with employment and its effect on interstate commerce.'" The court reasoned "Congress is not required to make 'particularized findings in order to legislate.'" *Id.* (quoting *Perez v. United States,* 402 U.S. 146, 156, 91 S.Ct. 1357, 1362, 28 L.Ed.2d 686 (1971)); *see Bolin v. Cessna Aircraft Co.,* 759 F.Supp. 692, 707 (D.Kan.1991) (Judge Theis cited the passage from *Lane* quoted above).

I believe a rational basis supports a finding that guns affect interstate commerce, and that prohibiting guns in school zones is a reasonable means of getting guns off the streets. In my view, given the situation as it exists in our present day society, the time has come for the full weight of the United States to be brought to bear in the area with which we are dealing. It should have taken

ing the unconstitutionality of § 922(q) in its present form." *Id.* at 452 n. 5.

**19.** The *Holland* court relied upon *Perez,* ruling that guns in school zones was a class of activity (firearms) Congress previously found to affect interstate commerce. In so ruling, the court discussed the legislative history behind the 1968 Omnibus Crime Control and Safe Streets Act in which the court concluded "Congress had ample information that firearms possession affected interstate commerce." *Holland* at *1. The *Holland* court also noted that § 922(q) was a part of the Comprehensive Crime Control Act and that the comprehensive act was "intended to provide a legislative response to various aspects of the problem of crime in the United States. The damage inflicted by criminal—whether it be physical, emotional, or monetary—takes a heavy toll on our society. Ultimately, each of our citizens is a victim of such activity." *Id.* at *2. The

court reasoned it was unnecessary for Congress "to specify an interstate nexus requirement in each subsection" of the comprehensive act. *Id.*

**20.** There is another basis upon which the Tenth Circuit apparently would disagree with the Fifth Circuit. The Fifth Circuit argued at some length the regulated activity must not merely affect interstate commerce, but must *substantially* affect interstate commerce. *See Lopez,* 2 F.3d. at 1361–63. The Tenth Circuit Court of Appeals, however, has stated "Congress has the inherent power to prohibit criminal activity under the Commerce Clause even though the effect of such activity on interstate commerce may be *de minimis.*" *United States v. Esch,* 832 F.2d 531, 540 (10th Cir.1987), *cert. denied,* 485 U.S. 908, 991, 108 S.Ct. 1084, 1299, 99 L.Ed.2d 242, 509 (1988) (citing *Perez v. United States,* 402 U.S. 146, 150–51, 91 S.Ct. 1357, 1359–60, 28 L.Ed.2d 686 (1971)).

no hearing in 1990 for Congress to recognize the use of weapons, particularly in concert with drug activities and gang-related activities, seems to pervade our entire society. Every city has been impacted. The senseless violence resulting from the use of these weapons—random shootings, drive-by shootings—is commonplace. Regrettably, our young folks today have taken up these practices. It would appear that possession of a gun is a badge of honor. More importantly, is not the school ground a most important vestige, the one place where children are entitled to a safe and secure harbor free of fear and violence? Are not these children the nation's future? Does Congress really need a hearing or further findings to recognize the importance of it all? I think not. In my view, enactment of § 922(q) is an important first step to bring to bear the prohibition of guns in the hands of anyone, particularly children at school. I have no problem with the Gun–Free School Zones Act. If the Tenth Circuit sees it otherwise, it may say so.

IT IS ACCORDINGLY ORDERED this 12th day of January, 1994, that defendant Glover's motion to dismiss the indictment (Dkt. No. 19) is denied.